Patrick O'DONNELL and Sandra O'Donnell, individually and on behalf of their then minor Children, John O'Donnell, Ruth O'Donnell, Nathan O'Donnell, Valerie O'Donnell, Alicia O'Donnell, John O'Donnell and Ruth O'Donnell, in their own right, Plaintiffs,

v.

Susan BROWN, Christopher Baldwin, Toni Beatti and officer Doe, individually and in their official capacities as police officers for the City of Lansing Police Department; Mark Alley, individually and in his official capacity as Chief of the City of Lansing Police Department; Colin Parks and Colleen Duhm, individually and in their official capacities as social workers for the Ingham County Child Protective Services; Joye Sharp and Margaret Mays, individually and in their official capacities as social worker supervisors for the Ingham County Child Protective Services; and The City of Lansing, Michigan and The City of Lansing, Michigan Police Department, Defendants.

No. 5:02–CV–143.

United States District Court, W.D. Michigan, Southern Division.

July 30, 2004.

788

792

Michael D. Dean, Waukesha, WI, David Kallman, Lansing MI, for Plaintiffs.

Margaret A. Nelson, Asst. Atty. Gen., Lansing, MI, Mark V. Schoen, Michigan Department of Attorney General, Tort Defense, Div., Lansing, MI, David K. Otis, Plunkett & Cooney, P.C., Lansing, MI, for Defendants.

## OPINION

QUIST, District Judge.

Plaintiffs in this case are the O'Donnell family: Patrick, the father, Sandra, the mother, and their six children, John, (17), Ruth, (16), Nathan, (12), Valerie, (9), Alicia, (6), and Rachael, (6 months).[1] Defendants are the City of Lansing ("the City"); the Lansing Police Department ("LPD"); LPD officers Susan Brown, Christopher Baldwin, and Tony Beatti; LPD Chief Mark Alley in his official capacity; and Ingham County Child Protective Services ("CPS") caseworkers Colin Parks and Colleen Duhm and their supervisor, Joye Sharp. CPS is a part of the state Family Independence Agency ("FIA").

This case arises from the entry into and temporary removal of the O'Donnell children from the family's home while the parents were out of town on September 16, 2000. Based on these events, Plaintiffs filed this action pursuant to 42 U.S.C. § 1983[2], asserting various federal consti-

---

1. Ages are as of September 2000, when the incidents giving rise to this case occurred.

2. Section 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

tutional claims, along with related state constitutional and other state law claims. Now before the Court are three summary judgment motions: one filed by Plaintiffs; a second filed by Defendants the City, the LPD, Brown, Baldwin, Beatti, and Alley (the "City Defendants"); and a third filed by Parks, Duhm, and Sharp (the "CPS Defendants"). For the reasons discussed below, summary judgment will be granted in part and denied in part for Plaintiffs; granted in part and denied in part for the City Defendants; and granted in part and denied in part for the CPS Defendants.

## I. *Background*

On Friday, September 15, 2000, Patrick and Sandra O'Donnell departed for a weekend business trip to North Carolina, with plans to return Sunday night or Monday. They left the two older children, John and Ruth, in charge of the younger children. John had a driver's license and was trained in CPR, first aid, and life saving. Nathan, the 12 year old, had emergency and scout training. The parents left an envelope containing emergency and other contact information, insurance cards, and cash near the telephone in the living room.

On Saturday, September 16, Patrick O'Donnell's sister, Kathleen Shattuck, spent the day at the O'Donnell home. John, Ruth, and Nathan went to a youth activity that afternoon, and Kathleen left after they returned home. At approximately 8:15 p.m., John and Ruth left to go to the house of their pastor, Glenn Ray, and to take a video to a friend, Rhonda Carpenter. They planned to be gone for two to three hours and left Nathan in charge of the younger children, telling him where they would be and saying they would return in several hours.

After John and Ruth left the house, Sandra O'Donnell's mother, Roseann Hewson, called the O'Donnell home. Nathan was outside helping a neighbor, so Hewson spoke with Alicia. Hewson then called Sandra's sister, Pat DeLong. DeLong called 911 to make a child neglect report. LPD officers Baldwin and Beatti were dispatched to the house in order to investigate the report. Nathan let the officers into the house and told him where his parents were. Beatti inspected the house while Baldwin talked to Nathan. Nathan showed the officers the envelope and gave them his parents' and the other children's names. Nathan also gave Baldwin Rhonda Carpenter's number, and Baldwin called her house and left a message with Rhonda for John to call him. Baldwin also gave Nathan a phone number for the police dispatch.

When John and Ruth arrived at the Carpenter house, Rhonda told John to call home. John called and spoke with Nathan, who told him that the police had come to the house after receiving an anonymous report of child neglect and that the officers were checking on the children's welfare. Nathan gave John the police dispatch number, which John called and spoke with Officer Baldwin. Baldwin instructed John to return home immediately and said the police would return to the house with Department of Social Services personnel. John said he would return shortly but not immediately. John and Ruth left for home several minutes after speaking with Officer Baldwin.

After talking to John, Baldwin spoke with Sgt. Brown at the precinct, who suggested that he call Child Protective Services. Baldwin called CPS worker Parks. The contents of the conversation between Baldwin and Parks are somewhat disputed.

Baldwin returned to the O'Donnell home a second time by himself at approximately 10:30 p.m., by which time John and Ruth were back home. John saw Baldwin arrive and stepped out the front door to

meet him in the yard. Baldwin said he was there to gather information for his report and asked for the parents' names and the children's ages. John refused to give Baldwin any information other than his own name, age, and birth date. John also refused Baldwin's request to enter the home, saying he had no warrant and had already seen the children earlier. Baldwin then told John he might be arrested for not cooperating. Meanwhile, a neighbor, Jenny Lamphere, came over and told Baldwin that an aunt had been there during the day, gave him her name and phone number, and offered to sleep on the O'Donnell's couch overnight until the parents returned.

Baldwin then departed and returned to the precinct, where he called Parks again and gave him information about the situation at the O'Donnell home. A second complaint had come in to 911. Parks contacted the source, who said that the children had been left alone in the past. Parks contacted Hewson to make arrangements for the children to be placed with her if necessary. Parks called Margaret Mays, the on-call supervisor at CPS. Mays referred Parks to CPS supervisor Joye Sharp. Plaintiffs claim Sharp told Parks to return to the home to gather more information; Defendants claim Sharp merely concurred with Parks' decision to do so. Plaintiffs also claim Sharp instructed Parks to contact the on-call family court intake referee, Carol Whitworth, whereas Defendants claim Sharp only concurred in Parks' decision to do so. Parks also contacted CPS worker Colleen Duhm to assist with the investigation. According to the police, a decision was made to return to remove the children from the home, and Referee Whitworth issued a verbal court order to that effect.

Parks and Duhm met Baldwin and Beatti at the police station. Baldwin also called Officer Brown, who said she would come to the house. The officers and CPS workers departed the station and arrived at the O'Donnell home. In the meantime, John had hidden the envelope with his parents' contact information. John refused to let the officers in when they knocked on the door, saying they lacked a warrant. The officers then asked John to step outside, which he did. The police and CPS workers told John they needed to get into the house to check on the welfare of the children. Baldwin told John that he would be arrested if he did not cooperate. John continued to block the door and refused to let the officers and CPS workers in because they lacked a warrant. After about 15–20 minutes of conversation on the front porch, Baldwin arrested John for obstruction, handcuffed him, and took him to a squad car.

After John's arrest, Ruth too refused to let the officers into the home. She called the family's pastor to tell him what was happening. Officer Beatti spoke with the pastor and continued to speak with Ruth for about 10 minutes. Then the officers decided to enter the home without Ruth's consent. After following the police in, Parks and Duhm inspected the home. According to Parks, he then reached the decision to remove the children, so he called Sharp and then Referee Whitworth to get verbal authorization for the removal and placement of the children in a relative's foster care. Meanwhile, the family's pastor arrived. John, who was sitting in the squad car, informed him where the envelope with the contact and emergency information was located. The police brought John to the precinct station, booked him, and put him in a holding cell. The family's pastor posted bail, and John was permitted to leave at around 3:00 a.m. Meanwhile, the other children were taken to their grandmother Hewson's house.

Parks made arrangements to set a hearing for Monday, September 18, which the O'Donnell parents attended. At the hearing, FIA concluded that the child neglect complaint was unsubstantiated, the investigation was closed, the case was dismissed, and the children were returned to their parents.

Plaintiffs later filed their complaint, which sets forth the following claims: (1) violation of rights against unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and Art. I, § 11 of the Michigan Constitution; (2) deprivation of liberty without due process in violation of the Fourteenth Amendment to the United States Constitution; (3) violation of constitutional rights to familial integrity; (4) false arrest in violation of M.C.L. § 750.479; (5) false imprisonment; and (6) negligence. As relief, Plaintiffs seek compensatory and punitive damages; a declaration that Defendants' actions were unconstitutional; a declaration that the statutes and protocols were unconstitutional as applied by Defendants; a preliminary and permanent injunction against Defendants from engaging in the allegedly unconstitutional actions; and a preliminary and permanent injunction against Defendants from applying and enforcing statutes and protocols in the allegedly unconstitutional manner.

## II. *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

■ A motion for summary judgment is properly supported if the moving party shows that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the moving party makes its showing, the non-moving party must demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi*, 4 F.3d 1378, 1384 (6th Cir. 1993). The court must draw all inferences in a light most favorable to the non-moving party when evaluating a summary judgement motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578–88, 106 S.Ct. 1348, 1352–58, 89 L.Ed.2d 538 (1986). It may, however, grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356).

## III. *Discussion*

### A. Plaintiffs' Motion for Summary Judgment

Plaintiffs ask for summary judgment on their first (i.e., Fourth Amendment) and second (i.e., Fourteenth Amendment procedural due process) claims, reserving the other claims for adjudication at trial. Regarding the first claim, all Plaintiffs allege that Defendants violated their rights by entering their home without a warrant; Plaintiffs Ruth, Nathan, Valerie, Alicia, and Rachael O'Donnell allege that Defendants violated their rights by seizing and removing them from their home; and Plaintiff John O'Donnell alleges that the police officer Defendants violated his rights by arresting and detaining him for obstructing the entry into the home. Regarding the second, procedural due pro-

cess claim, all Plaintiffs allege that they were deprived of their constitutional liberty (i.e., family integrity) rights without due process by Defendants' entry into their home and seizure of their children.

As the following discussion explains, the fundamental problem with Defendants' conduct is that the referee's verbal order did not comprise valid authority to either enter the home or remove the children. The Fourth Amendment required a written order for these actions, and no exigent circumstances existed to obviate this requirement. Moreover, John's arrest and detention for obstruction were unlawful because the entry he attempted to prevent was itself unlawful. The Court will therefore enter summary judgment for Plaintiffs on their Fourth Amendment claims. Summary judgment is also appropriate for Plaintiffs on their procedural due process claims because they were deprived of their constitutionally protected liberty interest in familial integrity without adequate process of law.

### (1) Fourth Amendment

### (a) Entry into Home

██ The Fourth Amendment protects against unreasonable searches and seizures. Government entry into a private home is considered a search implicating the Fourth Amendment. *See Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990); *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980); *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 3134, 32 L.Ed.2d 752 (1972) ("physical entry into the home is the chief evil against which the wording of the Fourth Amendment is directed"). Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, except pursu-

ant to few specifically established and well-delineated exceptions, such as the exigent circumstances exception discussed later in this opinion. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

Defendants assert that Referee Whitworth's verbal order authorizing removal of the children constituted valid authority for the police and the CPS social workers to enter the home. In support of this proposition, Defendants point to a Michigan Court Rule then in effect, M.C.R. 5.963(B) [3], which stated:

> The court may order an officer or other person to immediately take a child into custody when, after presentment to the court of a petition, a judge or referee has reasonable grounds to believe that conditions or surroundings under which the child is found are such as would endanger the health, safety, or welfare of the child. The court shall inquire whether a member of the child's immediate or extended family is available to take custody of the child pending preliminary hearing and whether there has been a central registry clearance and whether a criminal history check has been initiated. . . .

Also, Defendants contend that their actions were permitted under M.C.L. § 712A.14, which permits police officers, "without the order of the court," to "immediately take into custody any child . . . whose surroundings are such as to endanger his or her health, morals, or welfare."

██ While the aforementioned court rule and statutory provision may authorize the seizure of a child in the circumstances they describe, they do not give the police or anyone else the authority to enter a home to effect the seizure. State statutes and regulations cannot be construed to

---

**3.** Former M.C.R. 5.963(B) has been revised and renumbered M.C.R. 3.963.

displace the protections of the United States Constitution—even when the state acts to protect the welfare of children. *Cf. Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 540–41, 121 S.Ct. 2404, 2414, 150 L.Ed.2d 532 (2001). The entry itself must satisfy the Fourth Amendment, which generally requires a warrant; "the Fourth Amendment applies to [social workers], as it does to all other officers and agents of the state whose requests to enter, however benign or well-intentioned, are met by a closed door. There is ... no social worker exception to the strictures of the Fourth Amendment." *Walsh v. Erie County Dep't of Job & Family Servs.*, 240 F.Supp.2d 731, 746–47 (N.D.Ohio 2003) (citing *Roska v. Peterson*, 304 F.3d 982, 989 (10th Cir.2002) (warrantless no-knock entry violated Fourth Amendment absent exigency of imminent danger to child's welfare)); *Calabretta v. Floyd*, 189 F.3d 808, 816 (9th Cir.1999) ("[*Wyman* ] does not hold that a social worker may enter the home despite the absence of consent or exigency."); *Lenz v. Winburn*, 51 F.3d 1540, 1547 (11th Cir.1995) (even though social worker's intrusion was motivated by concern for child's welfare, "and not as part of any investigation, the search falls within the ambit of the Fourth Amendment"); *Franks v. Smith*, 717 F.2d 183, 186 (5th Cir.1983) ("A section 1983 claim can also lie against others, such as social workers, where actions by them were taken in their official capacity as state employees."); *State in Interest of A.R.*, 937 P.2d 1037, 1040 (Utah Ct.App.1997) ("the Fourth Amendment's prohibition on unreasonable searches and seizures applies whenever an investigator, be it a police officer, a DCFS employee, or any other agent of the state, responds to an alleged instance of child abuse, neglect, or dependency.").

■ Accordingly, even if the referee's order authorized taking the children into custody, the Court must conduct a sepa-rate Fourth Amendment analysis to determine whether that order also constituted a valid search warrant authorizing entry into the home. The Court concludes that it did not because it was merely a verbal order when it should have been in writing.

Some states permit the issuance of search warrants by telephone. *See White v. State of Mississippi*, 842 So.2d 565, 569–70 (Miss.2003) (listing states where judicial officials may authorize searches telephonically). State statutes, court rules, and judicial decisions permitting telephonic search warrants have been held not to violate federal or state constitutional guaranties against unreasonable searches and seizures. *See* 38 A.L.R.4th 1145 § 3 (2004) (listing cases).

Michigan does not have a statute permitting search warrants to be issued by telephone. The closest thing under Michigan law is M.C.L. § 780.651, which authorizes the issuance of search warrants by "electronic or electromagnetic communication." The statute at the time of this incident stated: "A judge may issue a *written* search warrant in person or by an electronic or electromagnetic means of communication." M.C.L. § 780.651(3) (emphasis added). "The peace officer or department receiving an electronically or electromagnetically issued search warrant shall receive proof that the issuing judge or district court magistrate *has signed the warrant* before the warrant is executed. Proof that the issuing judge or district court magistrate has signed the warrant may consist of an electronically or electro-magnetically transmitted facsimile of the *signed warrant*." M.C.L. 780.651(4) (emphasis added). M.C.L. § 780.651 was amended in 2002 to clarify that transmission by means of "electronic or electro-magnetic communication" includes transmission "by facsimile or over a computer network," but these are only additional

methods of transmitting a written document. The Michigan statute does not authorize "verbal" search warrants such as the one purportedly issued in this case. In the instant case, Referee Whitworth did not comply with M.C.L. § 780.651 because her purely verbal order never existed in written form.

Courts in some states that, like Michigan, do not permit verbal, telephonically conveyed search warrants, have nonetheless upheld such "warrants" in cases where exigent circumstances[4] existed or certain procedural safeguards were observed. *See* 38 A.L.R.4th 1145 § 4 (2004). As discussed later in this opinion, exigent circumstances did not arise in this case. As for procedural safeguards, none were followed here.[5] The referee did not, for example, make a contemporaneous written record and recording of the telephone conversations. *State of Minnesota v. Cook,* 498 N.W.2d 17, 21–22 (Minn.1993). The referee did not promptly issue a written confirmatory search warrant and file it. *State of New Jersey v. Valencia,* 93 N.J. 126, 459 A.2d 1149, 1155 (N.J.1983). In short, Defendants have demonstrated no indicia of compliance with minimal procedural safeguards to support the validity of the oral order.

Defendants claim that their entry into the home was further justified because, at the time of the incident at issue in this case, it was the Police Department's and Child Protective Services' policy for a referee to verbally authorize police to enter homes in order to take children into custody. If that was the Police Department's policy, it was constitutionally defective for the reasons already discussed. Moreover, several CPS social workers testified that they knew that a referee's verbal order only gave authority to remove and place children, and that such an order did not comprise authority to enter the home if that was where the children were located. (Parks Dep. at 212, Pl.'s Br. Supp. Mot. Summ. J. Ex. 7.) ("[the referee] couldn't give me authorization to enter a home"); (Duhm Dep. at 29, *Id.* Ex. 8.) ("I don't have the authority to enter a home without a court order—actually I don't know that I have authority to enter the home without the police"); (Sharp Dep. at 19, *Id.* Ex. 9.) ("The referees give verbal orders, but not to enter homes but to remove children and to place children."). In addition, the Police Department at least belatedly recognized that verbal orders could not authorize entry into a home. On October 12, 2000, Lansing Police Department Chief Alley issued a memorandum addressed to "LPD Officers" and titled "Taking Custody or Removal of Children in Suspected Abuse or Neglect Cases," stating:

In the past, when F.I.A. workers state they have a "verbal" court order to remove or place children we have assisted them in carrying out this action. This practice was recently reviewed and de-

4. Exigent circumstances are more correctly viewed as an exception to the warrant requirement altogether.

5. In *White v. State of Mississippi,* 842 So.2d 565 (Miss.2003), the Court remarked that typical procedural safeguards ensuring the authenticity and proper issuance of a telephonic search warrant include:

(1) that the entire telephone conversation be recorded; (2) that the officer seeking the warrant is placed under oath by the impartial magistrate while the officer relates the facts supporting a finding of probable cause; and (3) that a paper copy is prepared and provided to the premises owner—either by means of facsimile machine or by requiring the magistrate to read aloud word-for-word the contents of the search warrant he or she has authorized for copying by the officer executing the warrant. *Id.* at 570 (citing ABA Criminal Justice Section, *Guidelines for the Issuance of Search Warrants* 73–76 (1990)).

termined to be inconsistent with applicable statutes and court rules.

As Law Enforcement Officers we have the authority to immediately take children into protective custody who are endangered, according to MCL 712A.14. Because court orders vary in language and thus vary in the amount of authority we can use to execute the order, it is important that we have the court order in our possession before enforcing it. In the event that a person is arrested for obstructing or interfering with officers when taking children into protective custody, the person should be advised that a court order exists prior to the arrest, and that information should be included in the Officer's report.

I have advised the F.I.A. that we will no longer be assisting them in executing a verbal court order which was made to the case worker from a Judge or Referee over the phone. When reviewing these orders, it is important that you read and understand what authority the order gives you in removing the children. Absent exigent circumstances, the order should also include the authority to enter a residence if the children are not already in custody of the officer. Please review and retain the attached information regarding taking custody or removal of children. This information will be covered in our updated Procedure Manual.

(Pl.'s Br. Supp. Mot. Summ. J. Ex. 19.)

Regardless of what CPS's or LPD's policies were at the time, the entry required a search warrant and the verbal order did not satisfy that requirement. Therefore, the Court finds that the entry into the O'Donnell home was a presumptively unreasonable warrantless search under the Fourth Amendment.

However, a warrantless search may overcome the presumption of unreasonableness for Fourth Amendment purposes if an exception to the warrant requirement applies. Defendants argue that the warrantless entry into the O'Donnell home was lawful under the exigent circumstances exception.[6] "The exigent circumstances exception to the warrant requirement is narrowly drawn." *United States v. Ball,* 90 F.3d 260, 263 (8th Cir.1996). It is the government's burden to overcome the presumption that a warrantless entry was unreasonable within the meaning of the Fourth Amendment by establishing the exception. *United States v. Oliver,* 686 F.2d 356, 371 (6th Cir.1982). When the underlying facts are essentially undisputed and a finder of fact could reach but one conclusion as to the existence of exigent circumstances, the issue may be decided by the trial court as a matter of law. *Ewolski v. City of Brunswick,* 287 F.3d 492, 501 (6th Cir.2002).

According to the Sixth Circuit, exigent circumstances justifying warrantless entry occur within four general categories: 1) hot pursuit of a fleeing felon; 2) imminent destruction of evidence; 3) the need to prevent a suspect's escape; and 4) a risk of danger to the police or others. *United States v. Rohrig,* 98 F.3d 1506, 1515 (6th Cir.1996). The dispute in this case centers on the fourth category, that is, whether the scenario posed an adequately grave risk of danger to the O'Donnell children.

"Exigent circumstances" occur where "real immediate and serious consequences" would "certainly occur were a police officer to postpone action to get a warrant." *O'Brien v. City of Grand Rapids,* 23 F.3d 990, 997 (6th Cir.1994) (inter-

---

**6.** Valid consent is another exception to the warrant requirement, but Defendants make no argument that consent to enter the home was granted here.

nal quotation marks and citation omitted); *see also United States v. Williams,* 354 F.3d 497, 503 (6th Cir.2003). There must be a "need to protect or preserve life or avoid serious injury." *O'Brien,* 23 F.3d at 997 (quoting *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978)). "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey,* 437 U.S. at 392, 98 S.Ct. at 2413. However, the authorities must be presented with a "true immediacy" and a "real danger that serious consequences would certainly occur." *Williams,* 354 F.3d at 504. Exigent circumstances do not exist where "no evidence indicates that [plaintiffs' children were] in immediate threat of death or severe physical harm." *Roska v. Peterson,* 304 F.3d 982, 990 (10th Cir.2002), *abrogated in part on other grounds,* 328 F.3d 1230 (10th Cir.2003). The mere possibility of danger is not enough. *Tenenbaum v. Williams,* 193 F.3d 581, 594 (2d Cir.1999).

■ The Court finds as a matter of law that exigent circumstances did not justify entry into the O'Donnell home because the facts Defendants point to do not indicate imminent or likely harm. First, any perceived danger to the children was merely speculative and insufficiently serious. Referee Whitworth is the only person in this case who even claims to have believed exigent circumstances existed. She says she reached this conclusion because of the facts that three young children, one of whom was a six month old baby, were left for the evening under the supervision of a twelve year old, and that authorities were unable to contact the parents, posed a potential risk to the children's health and safety.[7] These facts perhaps raise reasons for concern, but they do not reach to the level of exigent circumstances to support a warrantless entry. Defendants have failed to alert the Court to any specifically evident indicia of danger.

■ Second, even if the situation posed a serious risk of danger to the children, there is no indication that any potential harms would imminently come to fruition. The rationale for the exigent circumstances exception is that some situations require immediate action, with no time to get a warrant. *See United States v. Rohrig,* 98 F.3d 1506, 1517 (6th Cir.1996) ("the cases finding exigent circumstances uniformly cite the need for prompt action by government personnel, and conclude that delay to secure a warrant would be unacceptable under the circumstances"). In the instant case, Defendants have offered no evidence that there was no time to get a warrant.

What is more, the police officers' own admissions belie the impotence of Defendants' exigent circumstances argument. These individuals, who were on the scene at the O'Donnell home, acknowledge that they did *not* believe that the situation was serious enough to be considered exigent. (City Def.'s Br. Supp. Mot. Summ. J. at 31 ("according to the officers, they did not believe the minor children were in immediate danger and thus exigent circumstances did not exist")). In addition, when asked if he perceived any actual dangers or risks before entering the home, CPS worker Parks testified that he only saw a "poten-

---

7. In her deposition, referee Whitworth was asked: "Based on the information that at least Colin Parks gave you, what did you understand would have been exigent circumstances in this case?" She answered: "That the—the kids were there alone with youn-

ger—with a young baby. And there was no adult around, nor could they find an adult. And I—I don't know if the kids weren't telling or what the situation was." (Whitworth Dep. at 34, CPS Def.'s Br. Supp. Mot. Summ. J., Ex. 9.)

tial for harm" based on the facts that a 12 year old was in charge and the authorities could not contact the parents. (Parks Dep. at 66–67, Pl.'s Br. Supp. Mot. Summ. J. Ex. 7.)

In sum, Defendants speculate about possibilities, but they fail to point out any concrete "reason to believe that the children were at such risk of harm or injury that immediate action was necessary." *Walsh*, 240 F.Supp.2d at 749. The truth of the matter is that Defendants failed to get a warrant, not because they had no time and needed to act immediately, but because they believed they did not need one; in their mistaken view, the verbal authorization was enough. Defendants' exigent circumstances argument merely serves to obscure their misapprehension of the law governing entry into homes.

### (b) Seizure of Ruth, Nathan, Valerie, Alicia, and Rachael

 Plaintiffs seek summary judgment on the question of whether the removal of Ruth, Nathan, Valerie, Alicia, and Rachael from the family home violated the Fourth Amendment. The Court has determined that the *entry* into the O'Donnell home violated the Fourth Amendment as a matter of law because the government officials lacked a warrant and the circumstances were not exigent. Plaintiffs contend that the unlawful entry also automatically makes the *seizure*[8] (that is, the taking into custody) of the children a Fourth Amendment violation.[9] This position is incorrect, as the entry and the seizure require separate analyses. Even if the entry into the home violated the Fourth Amendment, the seizure of the children may not have. However, an independent analysis of the seizure leads the Court to conclude that it too violated the Fourth Amendment, and thus summary judgment for Plaintiffs on this issue is appropriate.

 Government officials may take a child into custody under two circumstances. First, seizure is permitted when duly authorized by a court order. *See, e.g., Brokaw v. Mercer County*, 235 F.3d

---

**8.** The removal of a child from his family home by social workers is a "seizure" implicating the Fourth Amendment. *See, e.g., Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir.2000) (determining that a child who was carried out of his home, placed in a car, and driven away was not free to leave and thus was "seized" within the meaning of the Fourth Amendment); *Wooley v. City of Baton Rouge*, 211 F.3d 913, 925 (5th Cir.2000) (the Fourth Amendment extends beyond criminal "arrests" to include civil "seizures"); *Tenenbaum v. Williams*, 193 F.3d 581, 601–606 (2d Cir.1999) (analyzing removal of a child by the state during an abuse investigation as a seizure under the Fourth Amendment); *J.B. v. Washington County*, 127 F.3d 919, 928–31 (10th Cir.1997) (county officials' temporary removal of a child is a seizure implicating the Fourth Amendment); *Wallis v. Spencer*, 202 F.3d 1126, 1137 n. 8 (9th Cir.2000) (removal of children should be assessed under the Fourth Amendment).

**9.** Plaintiffs cite *People v. Woodard*, 111 Mich. App. 528, 532, 314 N.W.2d 680, 683 (1981) in support of the proposition that absent exigent circumstances, illegal entry of a home renders a subsequent arrest of someone in the home illegal as well. In *Woodard*, the police entered a residence without a warrant and in the absence of exigent circumstances, and then arrested persons within the home, again without a warrant. In holding that the arrests violated the Fourth Amendment, the court cited *Payton v. New York*, 455 U.S. 573, 100 S.Ct. 1371 (1980), which held that absent exigent circumstances, a warrantless, nonconsensual entry into a suspect's home in order to conduct a warrantless arrest was unconstitutional. In neither *Woodard* nor *Payton* did the police have an arrest warrant, whereas in the instant case, the authorities at least arguably had some sort of authority, albeit defective, to remove the children. Thus, *Woodard* and *Payton* fail to dictate the result Plaintiffs seek—that the unlawful entry automatically makes the removal unlawful.

1000, 1010 (7th Cir.2000). The Michigan Court Rule in effect when this incident occurred permitted courts to issue an order to take a child into custody if presented with "reasonable grounds to believe that conditions or surroundings under which the child is found are such as would endanger the health, safety, or welfare of the child." M.C.R. § 5.963(B). Defendants appear to argue that oral orders suffice to permit the removal of children from a family's home but have provided no authority for this position, and the Court rejects it. For Fourth Amendment purposes, a verbal order to seize a child from his home is defective for the same reason as is a verbal order to enter (i.e., search) a home; both must be written to be valid orders under the Fourth Amendment. Thus, the removal of the minor children was not duly authorized by a valid court order.

Second, government officials may in some circumstances take custody of a child without a court order. Exigent circumstances of course provide one exception, but the Court has already determined that such circumstances did not exist in this case. However, Defendants argue that removal without a court order may also occur when supported by "probable cause." M.C.L. § 712A.14 permits any police officer, "without the order of the court, immediately [to] take into custody any child ... whose surroundings are such as to endanger his or her health, morals, or welfare." Although the Sixth Circuit appears not to have addressed the removal of children without a court order under the Fourth Amendment, Courts outside of the Sixth Circuit have held that seizure of a child is permitted if it "is pursuant to a court order, if it is supported by *probable cause,* or if it is justified by exigent circumstances, meaning that state officers 'have reason to believe that life or limb is in immediate jeopardy.'" *Brokaw,* 235 F.3d at 1010 (quoting *Tenenbaum v. Williams,*

193 F.3d 581, 605 (2d Cir.1999)) (emphasis added). *Brokaw* repeatedly spoke of probable cause and exigent circumstances in the disjunctive, indicating that the two are separate bases for removal. *See, e.g., id* at 1011 (in the absence of a court order, removal may be "justified by probable cause *or* exigent circumstances") (emphasis added). *Brokaw* analyzed a child removal under both the exigent circumstances and probable cause standards, concluding that neither was satisfied. *Id.* Other cases also indicate that *probable cause* comprises a justification for warrantless removal separate from exigent circumstances. *See Tenenbaum,* 193 F.3d at 603–605 (analyzing child's removal as a seizure under the Fourth Amendment, and considering whether a court order, probable cause, or exigent circumstances justified the child's removal); *Wooley v. City of Baton Rouge,* 211 F.3d 913, 925–26 (5th Cir.2000) (noting that a warrant, probable cause, or a reasonable belief that a child is in imminent harm is necessary to justify a seizure of a child under the Fourth Amendment); *J.B. v. Washington County,* 127 F.3d 919, 929 (10th Cir.1997) (applying probable cause standard to removal of child); *Wallis v. Spencer,* 202 F.3d 1126, 1138 (9th Cir.2000) ("state may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse"); *Donald v. Polk County,* 836 F.2d 376, 384 (7th Cir. 1988) (stating that caseworkers may, without court order, remove a child if they make a "finding of probable cause" that the child is "at risk of immediate injury").

The aforementioned authorities, whose holdings the Court does not necessarily adopt, suggest that even in the absence of a valid court order or exigent circumstances, children may be removed based on probable cause, which appears to be a

distinct and somewhat (but not much) lower standard than exigent circumstances. What this means is that probable cause may comprise an additional exception to the warrant requirement in the child seizure context. However, the parties have not cited, and the Court cannot find, any Sixth Circuit decision adopting or rejecting the probable cause standard in the child removal setting. In addition, "[t]he Supreme Court has yet to decide whether the temporary removal of children in cases of suspected abuse or neglect is governed by the probable cause standard." *J.B. v. Washington County*, 127 F.3d 919, 929 (10th Cir.1997).

 The Court will avoid deciding whether probable cause comprises an exception to the court order requirement in the child removal context because even if it does, Defendants have alleged no facts indicating that probable cause existed here. Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts," and requires reasonableness based upon the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). Defendants contend that there was probable cause to remove the children because the oldest sibling, John, had been arrested and removed from the scene and because the parents were out of town and could not be reached to discuss either a different placement or someone coming into the home. In addition, Defendants allege, an inspection of the house revealed piles of clothes stacked on the floor, absence of a smoke detector, water in the basement, and flammables near a water heater.[10]

In this case, the Court concludes that there was no probable cause to support removal of the children without a court order because based on the undisputed facts, the children's surroundings did not pose *any* "danger" to their health, morals, or welfare. Even after John was arrested, Ruth, a 16 year old who had received safe sitter training, remained at the home to care for the younger siblings. Defendants' only real argument is that Ruth was too young to be in charge of the other children. (CPS Defs.' Br. Supp. Mot. Summ. J. at 3 ("Parks did not feel Ruth, who was 16, should be left in charge for the remainder of the weekend.")). This argument can easily be rejected when one considers that 16 year olds are legally permitted to marry and have children of their own, M.C.L. § 551.103, and that a neighbor and the family's pastor offered to stay at the home. Thus, even if probable cause could justify removing children, Defendants have failed to meet that burden in this case. Accordingly, the seizure of Ruth, Nathan, Valerie, Alicia, and Rachael violated the Fourth Amendment as a matter of law.

### (c) Arrest and Detention of John

 John O'Donnell seeks summary judgment on the issue of whether his arrest and detention violated his Fourth Amendment rights (i.e., the first claim). The police arrested John for refusing to allow them entry to the house pursuant to M.C.L. § 750.479, which at the time of this incident stated in pertinent part: "Any person ... who shall so obstruct, resist, oppose ... any of the above named officers, or any other person or persons authorized by law to maintain and preserve the peace, shall be guilty of a misdemeanor...." John admits that he refused to give Officer Baldwin contact information for his parents; refused to provide information about his parents or the other chil-

---

**10.** Plaintiffs respond that the clothes were stacked in preparation for donation to charity, there was a smoke detector, the basement frequently has standing water after it rains, and the water heater was an old, disconnected unit.

dren; refused to let Baldwin into the house initially; and refused to let the officers into the house when they returned later with the CPS workers. The police contend that these refusals gave them probable cause to arrest John for the misdemeanor of resisting and obstructing the police.

A plaintiff bringing a constitutional claim for false arrest under the Fourth Amendment must show that there was not probable cause for the arrest. *Stemler v. City of Florence,* 126 F.3d 856, 871 (6th Cir.1997). It is well established that an arrest without probable cause violates the Fourth Amendment. *Donovan v. Thames,* 105 F.3d 291, 297–98 (6th Cir.1997). As the Court has already determined, the police were not permitted in the house in the first place because they had no warrant to enter and no exception to the warrant requirement such as exigent circumstances applied. It necessarily follows that the police had no probable cause to arrest and detain John for impeding their entry when the entry itself was not lawful. Accordingly, the Court will grant John summary judgment on the issue of whether his arrest and detention violated his Fourth Amendment rights.

### (2) Procedural Due Process

Plaintiffs seek summary judgment on their Fourteenth Amendment procedural due process claim. The constitutional guarantee of procedural due process requires that the government provide "due process" before making a decision to "infringe upon a person's life, liberty, or property interest." *Howard v. Grinage,* 82 F.3d 1343, 1349 (6th Cir.1996). Procedural due process "prohibits arbitrary and unfair deprivations of protected life, liberty, or property interests without procedural safeguards." *Id.* at 1350. The touchstone of procedural due process is the fundamental requirement that an individual be given the opportunity to be heard "in a meaningful manner." *Id.* at 1349. "[T]he right to a hearing prior to the deprivation is of constitutional stature." *Id.*

Procedural due process applies only to the deprivation of constitutionally protected liberty or property interests. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). To state a cognizable § 1983 claim based on the deprivation of procedural due process, the government's conduct in depriving a person of a protected liberty interest must go beyond mere negligence and must instead be grossly negligent, deliberately indifferent, or intentional. *Howard v. Grinage,* 82 F.3d 1343, 1350 (6th Cir.1996) (citing *Howard v. Grinage (Howard I),* 6 F.3d 410, 415 (6th Cir.1993) and *Franklin v. Aycock,* 795 F.2d 1253, 1262 (6th Cir.1986)). Here, there is no question that removing the children was intentional. Once the deprivation of a constitutionally protected liberty or property interest has been demonstrated, a court must determine whether a plaintiff was afforded adequate due process protection. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) ("Once it is determined that due process applies, the question remains what process is due."). Plaintiffs argue that the entry into the home and removal of the children deprived them of their protected liberty interest in family integrity, and that these events occurred without required pre-deprivation process.

Thus, in order to decide whether Plaintiffs merit summary judgment on their procedural due process claim, the Court must begin by determining whether Plaintiffs suffered a deprivation of the constitutionally protected right to family integrity. The right to family integrity has been recognized as a fundamental liberty interest protected by the Fourteenth

Amendment. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982) (there is "a fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (stating that parents have a fundamental right to direct the upbringing of their own children). *Wallis v. Spencer,* 202 F.3d 1126, 1136 (9th Cir.2000) ("Parents and children have a well-elaborated constitutional right to live together without governmental interference."); *Wooley v. City of Baton Rouge,* 211 F.3d 913, 923 (5th Cir.2000) ("a child's right to family integrity is concomitant to that of a parent"). Plaintiffs in their third cause of action (substantive due process) have alleged a violation of their protected liberty interest in familial relations.[11] Although the procedural and substantive due process claims in this case implicate the same liberty interest, the substantive claim requires a deprivation of greater severity.[12] In other words, it is not necessary for Plaintiffs to win on their substantive due process claim in order to make the less stringent showing of deprivation required for their procedural due process claim. In any event, Defendants do not even argue that the removal of the children did not implicate family integrity rights for purposes of the procedural due process inquiry. The Court therefore concludes that the removal of the children infringed upon the O'Donnell family's integrity rights in satisfaction of the procedural due process test's first prong.

 The second step in the procedural due process analysis requires a determination of whether Defendants provided Plaintiffs constitutionally adequate process before depriving them of their right to familial integrity. The law recognizes the state's right to interfere with family relationships when necessary, so long as the state complies with procedural due process requirements. *See, e.g., Doe v. Staples,* 706 F.2d 985, 988–89 (6th Cir. 1983); *Doe v. State of Louisiana,* 2 F.3d 1412, 1416–17 (5th Cir.1993); *Martinez v. Mafchir,* 35 F.3d 1486, 1489 (10th Cir. 1994). *See also Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) ("[T]he deprivation by state action of a constitutionally protected interest in life, liberty, or property is not itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law.") (internal quotation marks and citations omitted).

The Supreme Court has indicated that due process cannot be concretely defined. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands. Consideration of what procedures due process may require under any given set of circumstances must begin

11. Plaintiffs do not seek summary judgment on their substantive due process claim (i.e., third cause of action), maintaining that it should be resolved at trial. However, both the City Defendants and the CPS Defendants have moved for summary judgment in their favor on that claim. The Court discusses the substantive due process claim later in this Opinion.

12. However, it is possible for both a procedural and substantive due process claim to arise from the same conduct. *See Brokaw v. Mercer County,* 235 F.3d 1000, 1020 n. 16 (7th Cir.2000); *cf. Owen v. Lash,* 682 F.2d 648, 652 n. 4 (7th Cir.1982) (explaining that "[a] single act of depriving a citizen of his right ... may simultaneously constitute a violation of substantive constitutional right and of the right to procedural due process"); *see also Croft v. Westmoreland County Children & Youth Servs.,* 103 F.3d 1123, 1125 (3d Cir. 1997) ("The Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requisites of procedural and substantive due process.").

with a determination of the precise nature of the government function involved as well as the private interest that has been affected by government action." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) (internal quotation marks and alterations omitted). Three factors guide the determination of what process is due:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

 Plaintiffs contend that due process required notice and a hearing before the children were removed. "Before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Board of Regents v. Roth*, 408 U.S. 564, 570 n. 7, 92 S.Ct. 2701, 2705 n. 7, 33 L.Ed.2d 548 (1972) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971)). "However, due process does not require a formal and full-blown adversary hearing in every case." *Doe v. Staples*, 706 F.2d 985, 990 (6th Cir.1983). The hearing required is only one "appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subse-

quent proceedings." *Boddie*, 401 U.S. at 378, 91 S.Ct. at 786.

According to Defendants, Plaintiffs were accorded due procedural protections. Defendants state that: an investigation was initiated based on a complaint to the LPD; social services personnel investigated the complaint and concluded that the children were at risk of harm; the on-call referee conducted an *ex parte* hearing wherein she received information from CPS and decided to authorize removal of the children; Defendants had a compelling government interest in protecting the children until the parents returned home; no less restrictive means was available under the circumstances given the lateness of the night; the parents could not be reached, even after their contact information was provided; no other appropriate caregiver was immediately available; the children were placed with their grandmother in the most family-like setting available at the time; and the children were out of their home for only approximately 36 hours. Defendants further note that a formal hearing was scheduled for the Monday morning after the Saturday night of the incident to review the allegations and determine whether jurisdiction should continue; the parents were given notice of the hearing; the parents appeared at the hearing with representation; a guardian was appointed for the children to represent their interests; and the petition containing the allegations on which the removal was based was filed and presented to the parents prior to the hearing.

In reply to Defendants, Plaintiffs argue that they did not receive *any* process prior to the removal of the children. They contend that the *ex parte* hearing with Referee Whitworth does not constitute sufficient due process for two reasons: first, the CPS Defendants admit they entered the house and seized the children before Whit-

worth verbally issued the removal order (although the police say the order came before the children were taken), and second, Parks allegedly recklessly misrepresented or omitted key facts in his call to Whitworth. *See Malik v. Arapahoe County Dep't of Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir.1999) ("An ex parte hearing based on misrepresentation and omission does not constitute notice and an opportunity to be heard."). In addition, Plaintiffs contend that the CPS social workers failed to properly investigate the allegations of child neglect. *See Brokaw v. Mercer County*, 235 F.3d 1000, 1020 (2000) (absent exigent circumstances, due process requires an investigation).

Plaintiffs maintain that the process due in this case should be the same as that required in *Doe v. Staples*, 706 F.2d 985 (6th Cir.1983). There, the court required the following: (1) notice prior to removing a child, stating the reasons for removal; (2) a full hearing with the opportunity to present witnesses and evidence; (3) legal counsel; (4) a neutral and detached agency official presiding at the hearing; and (5) a written decision stating the reasons for the ruling. *Id.* at 990. However, Plaintiffs fail to recognize that *Staples* imposed process requirements based on the particular context of that case, as the law in this field requires. The Court cannot simply import the *Staples* requirements to the instant case, which differs from *Staples* in several respects and merits its own appropriately tailored process requirements. Here, the court referee gave verbal authorization to remove the children (although the unwritten order was legally ineffectual and the two groups of Defendants dispute whether the order came before or after the children

were removed from the home). Also, notice to the parents on the night of the incident was impossible because the children refused to provide contact information, and a hearing was held the following Monday at which the parents and their attorney were present.

Although *Staples'* requirements do not necessarily dictate the process required in this case, the Court finds that the process provided to Plaintiffs was constitutionally inadequate. The Sixth Circuit has not expressly ruled on the issue,[13] but law from other circuits suggests that at a minimum, due process requires a written order unless exigent circumstances are present. *See Brokaw*, 235 F.3d at 1020 (7th Cir. 2000) ("Minimally, [due process] also means that governmental officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances."). *See also Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir.1997) ("Removal of children from the custody of their parents requires pre-deprivation notice and a hearing except for extraordinary situations where some valid governmental interest is at stake that justified postponing the hearing until after the event.") (internal quotation marks and citation omitted); *Malik*, 191 F.3d at 1315 (a parent has a liberty interest in familial association and privacy that, absent extraordinary circumstances, cannot be violated without adequate pre-deprivation procedures). *Cf. Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983) ("When a child's safety is threatened, that is justification enough for action first and a hearing afterward."); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir.1994)

---

**13.** *Staples* did, however, affirm a district court decision holding that removal of a child from parents "must be, as a general rule, preceded by written notice and a hearing," 706 F.2d at 986, and that removal without

prior notice is permitted only where "exigent circumstances exist," that is, where removal "is necessary to protect the child from serious and imminent physical, psychological or emotional harm." *Id.* at 986–87.

("[O]nly where a child's life is in imminent danger or where there is immediate danger of severe or irremediable injury to the child's health (and prior judicial authorization is not immediately obtainable) may an official summarily assume custody of a child from his parents.").

The Court has already determined that the circumstances in this case were not exigent, and even if probable cause could support removal, that standard has not been met here either. Further, it is undisputed that the referee's order was verbal. The fact that the order was unwritten suffices to render the process provided to Plaintiffs inadequate—and this is not to mention the dispute as to whether the verbal order had been issued *before* the children were seized (if the verbal order was issued after the seizure, then Defendants cannot claim that Plaintiffs received even an *ex parte* hearing from the referee before the children were removed).

 The Court next rejects Defendants' contention that the hearing and court review on the Monday after the incident comprised an adequate post-deprivation remedy sufficient to absolve any earlier due process defects. In *Parratt v. Taylor*, 451 U.S. 527, 543–44, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981), the Supreme Court held that post-deprivation remedies that fully compensate a plaintiff for his loss of property are sufficient to satisfy the requirements of due process. The Sixth Circuit has extended the *Parratt* rule to deprivation of liberty rights. *See, e.g., Wilson v. Beebe,* 770 F.2d 578, 584 (6th Cir.1985); *Braley v. City of Pontiac,* 906 F.2d 220, 223 (6th Cir.1990). However, post-deprivation remedies will be adequate only when pre-deprivation remedies were "impossible," *Mertik v. Blalock,* 983 F.2d 1353, 1364–65 (6th Cir. 1993), for example, because of an emergency situation. *See Donald v. Polk County,* 836 F.2d 376, 380 (7th Cir.1988)

("In an emergency situation, the government may take away property or liberty, so long as postdeprivation notice and a hearing are provided."); *Jordan by Jordan,* 15 F.3d at 343 ("[I]t is well-settled that the requirements of process may be delayed where emergency action is necessary to avert imminent harm to a child ... provided that adequate post-deprivation process to ratify the emergency action is promptly accorded.") (internal citations omitted). This case involved no emergency, and it would not have been impossible to get a valid, written court order for the removal of the children. The only thing preventing Defendants from doing so was their mistaken belief that only a verbal order was necessary. Furthermore, courts permit post-deprivation process to make up for lack of pre-deprivation process when government officials commit "random or unauthorized" acts, but when government officials act according to an "established state procedure that itself violates due process rights," such as the faulty "verbal" court order in this case, post-deprivation remedies are inadequate. *Mertik,* 983 F.2d at 1365. For these reasons, the post-deprivation hearing was inadequate and Plaintiffs suffered a procedural due process violation.

**B. City Defendants' Motion for Summary Judgment**

The City Defendants' summary judgment motion sets forth the following arguments: (1) Plaintiffs' claim for violation of Art. I, § 11 of the Michigan Constitution must be dismissed because there are no inferred damage remedies against municipalities and individual government defendants under the Michigan Constitution; (2) the City of Lansing Police Department is not an entity subject to suit separate from the City of Lansing; (3) Plaintiffs' § 1983 claims against Defendants Brown, Baldwin, Beatti, and Alley in their official ca-

pacities must be dismissed because they are claims against the City of Lansing, which is named as a party in this suit; (4) Plaintiffs' § 1983 claims against the City of Lansing must be dismissed because Plaintiffs cannot present evidence of a policy or custom or a failure to train which resulted in the alleged violation of Plaintiffs' constitutional rights; (5) Plaintiffs' state law tort claims against the City of Lansing must be dismissed on the basis of governmental immunity; (6) Plaintiffs' claims against Chief Alley in his individual capacity must be dismissed because Plaintiffs cannot present evidence that he was in any way involved in this incident; (7) Plaintiff John O'Donnell's claim for violation of due process under the Fourth Amendment based on his arrest and detention, and the other (minor) children's claims under the Fourteenth Amendment based on their removal from the home, must be dismissed because such claims must be brought under the more specific Fourth Amendment; (8) Defendants Brown, Baldwin, and Beatti are entitled to summary judgment on the Fourth Amendment (i.e, first cause of action) and false arrest (i.e., fourth cause of action) claims because Plaintiff John O'Donnell admits in the complaint and in deposition testimony that he refused to cooperate and supply requested information to the officers and thus there was probable cause to arrest John O'Donnell for resisting and obstructing; (9) the Fourth Amendment claims by all the Plaintiffs based upon entry into the home and by the minor children for removal from the home do not amount to violations of the Fourth Amendment; (10) Defendants Brown, Baldwin, and Beatti are entitled to summary judgment on Plaintiffs Patrick and Sandra O'Donnell's First and Fourteenth Amendment claims because there were no procedural or substantive due process violations; and (11) in the alternative, the police officers are entitled to qualified immunity from Plaintiffs'

§ 1983 claims. The Court addresses each argument in turn below.

### (1) Article I, § 11 of the Michigan Constitution Claim

 The City Defendants seek summary judgment on Plaintiffs' claim for violation of Art. I, § 11 of the Michigan Constitution, which is set forth in the complaint's first cause of action (i.e., the § 1983 Fourth Amendment claim). This Michigan constitutional provision comprises the state law analog to the U.S. Constitution's Fourth Amendment. *See People v. Levine,* 461 Mich. 172, 178, 600 N.W.2d 622, 625–26 (1999). Plaintiffs acknowledge that under the Michigan Constitution, there is no judicially inferred cause of action for damages against municipalities or municipal government employees. *See Jones v. Powell,* 462 Mich. 329, 335, 612 N.W.2d 423, 426 (2000). However, they contend that Art. I, § 11 constitutes a right previously held under state law, the deprivation of which is actionable under § 1983.

Plaintiffs cite *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), but that case does not support their position. *Paul* stated that the Fourteenth Amendment's procedural due process guarantees are implicated when a state seeks to deny a person rights initially recognized and protected by state law. *Id.* at 711, 96 S.Ct. at 1165. For example, when a state issues drivers' licenses, it recognizes its citizens' right to operate a vehicle, and the state cannot later withdraw this right without giving the citizens due process. *Id.* (citing *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)). A plaintiff in such a situation may maintain a § 1983 action for violation of his Fourteenth Amendment due process rights. But contrary to what Plaintiffs in this case argue, *Paul* in no way suggests that a § 1983 action also arises for violation of

the substantive state law. The first cause of action, where the Michigan constitutional claim is found, is not a procedural due process claim, but rather a substantive claim for unreasonable search and seizure brought under § 1983. Accordingly, the City Defendants are entitled to summary judgment on Plaintiffs' claim for violation of the Michigan Constitution.

### (2) Whether City of Lansing Police Department is Subject to Suit Under § 1983

Defendants argue that all claims against the City of Lansing Police Department should be dismissed because the Police Department is not an entity subject to suit separate from the City of Lansing itself. The City of Lansing is also named as a Defendant in this action.

■■■ The capacity to sue or be sued is determined by the law of the state in which the district court sits or the law of the individual's domicile. Fed.R.Civ.P. 17(b). In this case, the law of Michigan controls. As interpreted by the state courts, Michigan's governmental immunity statute, M.C.L. 691.1401 *et seq.*, immunizes municipal police departments from suit. *See McPherson v. Fitzpatrick,* 63 Mich. App. 461, 464, 234 N.W.2d 566, 568 (1975) ("A municipal department, board or commission such as the Detroit Police Department, is unable to raise funds for payment and is not liable in tort.") (citing *O'Leary v. Bd. of Fire & Water Com'rs,* 79 Mich. 281, 44 N.W. 608 (1890)). Accordingly, Plaintiffs' claims against the City of Lansing Police Department are claims against the City of Lansing, and the Police Department will be dismissed as a defendant in this action.

### (3) Section 1983 Claims Against Lansing Police Officers

■■■ Defendants seek dismissal of Plaintiffs' § 1983 official capacity claims against Defendants Brown, Baldwin, Beatti, and Alley—all officers of the City of Lansing Police Department—because these claims are properly brought against the City of Lansing itself.

■■■ Unlike individual capacity suits, which seek to impose personal liability upon a government official for actions he takes under color of state law, official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978). "As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (citing *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985)). "It is not a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham,* 473 U.S. at 166, 105 S.Ct. at 3105. The Court concludes that any official capacity claims Plaintiffs bring against the police officers are claims against the City of Lansing and should be dismissed with respect to the officers themselves.

### (4) Section 1983 Claims Against City of Lansing

■■■ Defendants argue that the § 1983 claims against the City of Lansing must be dismissed because Plaintiffs cannot present evidence that the alleged violations of constitutional rights resulted from a policy, custom, or failure to train.

■■■ A municipality cannot be held liable under § 1983 for the acts of its employees solely on a respondeat superior theory. *Monell v. Dep't of Soc. Servs. of*

*City of N.Y.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Vicarious liability attaches to the municipality only when the municipality itself causes the constitutional violation at issue, which occurs when the harm results from the municipality's policy or custom. *See id.* at 694, 98 S.Ct. at 2037–38 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). *See also Doe v. Claiborne County, Tenn.,* 103 F.3d 495, 507 (6th Cir.1996) ("[a municipality] cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom within [the municipal entity] leads to, causes, or results in the deprivation of a constitutionally protected right"). To satisfy the *Monell* requirements, a plaintiff must identify the policy or custom, connect the policy or custom to the city itself, and show that the particular injury was incurred because of the execution of that policy or custom. *Id.* at 507–508.

The term policy "generally implies a course of action consciously chosen from among various alternatives." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). A policy reflects "a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986). A "custom" for purposes of *Monell* liability must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036 (internal quotation marks and citation omitted). In turn, the concept of "law" includes "[d]eeply embedded tra-

ditional ways of carrying out state policy." *Nashville, Chattanooga & St. Louis Ry. Co. v. Browning,* 310 U.S. 362, 369, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940). In short, a "custom" is a "legal institution that is permanent and established" but not memorialized by written law. *Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir.1993). A municipality's failure to train its employees amounts to a policy or custom only if it evidences a "deliberate indifference" to the rights of persons with whom the municipal employees come into contact. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).

The City Defendants inaptly depict the policies or customs that the police followed in entering the O'Donnell home and removing the children as those of Child Protective Services (a state agency), not of the Police Department (an entity of the City of Lansing). They contend that no Police Department policies or customs were the moving force behind the alleged violations of Plaintiff's constitutional rights. Rather, they argue, they acted based on the CPS policy that verbal authorization by a referee was adequate for entry and removal of the children. The Court rejects this characterization.

There can be no question that the Lansing Police Department officers worked according to and under the authority of the Lansing Police Department's policies, and not CPS's. It is true that the family court issued orders relating to the removal of children and that CPS workers took children into custody. But it was police officers who actually performed the act of forcibly entering the home to assist in executing the court order. In fact, CPS social workers, as they themselves acknowledge, cannot go into a home to remove children unless the police lead them in. The family court may have had a

"policy" of issuing verbal orders, but it was the Police Department's "policy" to assist CPS in carrying out those orders—and it was that departmental policy that resulted in constitutional harms to Plaintiffs in this case and thus implicates the City Defendants.

Earlier in this Opinion, the Court recounted Chief Alley's memorandum to the LPD's officers dated 12, 2000, in which he stated that the department's past policy of acting on verbal orders "was recently reviewed and determined to be inconsistent with applicable statutes and court rules." (Pl.'s Br. Supp. Mot. Summ. J. Ex. 19.) The memorandum decreed that officers could no longer follow this practice and announced the department's new policy requiring a written court order before police could assist in removing children from homes. The memorandum reveals that the police officers in this case were following the *Lansing Police Department's* policy when they entered the O'Donnell home and assisted in the removal of the children without a written court order.

 The Court further concludes that the Lansing Police Department's policy of entering homes pursuant to verbal court orders bore the requisite causal relationship to the constitutional harms Plaintiffs suffered. For § 1983 liability to ensue under *Monell*, the local government's policy or custom must be the "moving force" behind the constitutional violation. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2038. A plaintiff must show "a direct causal link" between the municipal policy or custom and the constitutional violation. *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir.1996). In other words, a plaintiff must "show that the particular injury was incurred because of the execution" of the policy or custom. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir.1993). "This requirement is necessary to avoid de facto respondeat superior liability explicit-

ly prohibited by *Monell.*" *Doe*, 103 F.3d at 508. The causal connection here is straightforward: the police, following departmental policy, made a warrantless, unconsented entry into the home and assisted in the seizure of the O'Donnell children where no exigent circumstances existed. Were it not for the policy of relying on verbal court orders, the entry would not have happened and none of the constitutional violations would have ensued. Accordingly, Plaintiffs' § 1983 claims against the City of Lansing survive the City's request for summary judgment.

**(5) Tort Claims Against City of Lansing**

Plaintiffs concede that naming the City of Lansing as a Defendant to the state law tort claims was improper because governmental immunity shields the City from those claims. Accordingly, the claims for false arrest, false imprisonment, and negligence against the City of Lansing will be dismissed.

**(6) Individual Capacity Claims Against Chief Alley**

 Defendants seek summary judgment on Plaintiffs' claims against Chief Alley in his individual (as opposed to official) capacity because, Defendants argue, Plaintiffs cannot present evidence that Chief Alley was in any way involved in this incident. In response, Plaintiffs argue that these claims survive because Chief Alley has submitted no evidence rebutting the inferences of supervisory liability arising from his own policy memorandum, state statutes, his position as Police Chief, and the Defendant officers' testimony.

 In order for liability to attach to Chief Alley in his individual capacity for the actions of his subordinates, Plaintiffs must prove that Alley "did more than play a passive role in the alleged violation or

showed mere tacit approval of the goings on." *Bass v. Robinson,* 167 F.3d 1041, 1048 (6th Cir.1999) (citing *Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1246 (6th Cir.1989) and *Hicks v. Frey,* 992 F.2d 1450, 1455 (6th Cir.1993)). "Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Bass,* 167 F.3d at 1048. Also, "[t]he law is clear that liability of supervisory personnel must be based on more than merely the right to control employees." *Hays v. Jefferson,* 668 F.2d 869, 872 (6th Cir.1982). As *Hays* further explains, "a failure of a supervisory official to supervise, control, or train the offending individual [employees] is not actionable absent a showing that the official either encouraged or in some way directly participated in [the constitutional violation]." *Id.* at 874. However, the supervisor's participation or encouragement may be implicit rather than direct: "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending [employees]." *Id.*

In this case, evidence exists suggesting that Chief Alley either directly or implicitly authorized, approved, or knowingly acquiesced in the Department's unconstitutional policy of entering homes and assisting in the removal of children without a written court order. For example, if Chief Alley was able to change the Department's policy by issuing a memorandum requiring that officers see a written court order before assisting CPS, the inference arises that he had some involvement in the earlier policy of acting under verbal orders. At a minimum, the scope of Alley's involvement vis-a-vis the unconstitutional policy remains a disputed issue of fact. Therefore, Plaintiffs' individual capacity claims against Chief Alley survive Defendants' request for summary judgment.

**(7) Children's Fourteenth Amendment Due Process Claims**

▇▇▇ Defendants seek summary judgment on the O'Donnell children's due process allegations against the City of Lansing Defendants set forth in the second (as opposed to the third) claim. According to Defendants, John O'Donnell's Fourteenth Amendment due process claim based on his arrest and detention, and the minor children's Fourteenth Amendment claims based on their removal from the homes, must be dismissed because these are substantive due process claims that must be brought under the Fourth Amendment. *See Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) and *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (unlawful search and seizure claims do not implicate Fourteenth Amendment substantive due process rights and must be brought under the more particular Fourth Amendment).

The Court rejects Defendants' argument because the Court reads the Plaintiffs' second claim to allege state procedural, not substantive, due process violations. Plaintiffs allege that Defendants failed to accord them constitutionally required procedural protections such as notice and a hearing. John and the other children are entitled to pursue the Fourteenth Amendment procedural due process claims set out in their second cause of action in addition to their Fourth Amendment unlawful search and seizure claims set out in the first cause of action. *See Tenenbaum v. Williams,* 193 F.3d 581, 595 (2d Cir.1999) (explaining that a child's procedural due process rights may be violated when government officials take the child into custody without proper authority). It is in the third cause of action for violation of familial integrity rights, and not in the second cause of action, that Plaintiffs' substantive due pro-

cess claims are stated. Accordingly, summary judgment for Defendants is not appropriate.

### (8) John's Fourth Amendment and False Arrest Claims

Defendants Brown, Baldwin, and Beatti seek summary judgment on Plaintiff John O'Donnell's claims against them for violation of the Fourth Amendment (first claim) and for the state law tort of false arrest (fourth claim).[14] The Court has already granted summary judgment to John on his Fourth Amendment claim for unlawful arrest and detention and thus will deny summary judgment for Defendants on that claim.

Turning to Defendants' state law false arrest claim, John asserts that the police lacked probable cause when they arrested him for violating M.C.L. § 750.479, which states in pertinent part that "who shall so obstruct, resist, oppose . . . any of the above named officers, or any other person or persons authorized by law to maintain and preserve the peace, shall be guilty of a misdemeanor. . . ." John admits that he refused to give Officer Baldwin contact information for his parents; refused to provide information about his parents or other children; refused to let Baldwin into the house initially; and refused to let the officers into the house when they returned later with CPS workers. The police contend that these refusals gave them probable cause to arrest John for the misdemeanor of resisting and obstructing the police, and that such probable cause is all they need to defeat a prima facie false arrest claim. The Court will deny Defendants summary judgment on John's false arrest tort claim because the Court has already determined that the police lacked probable cause to make the arrest.

### (9) Fourth Amendment Claims

The City Defendants seek summary judgment on Plaintiffs' allegations stated in the first claim, arguing that the entry into the home and removal of the children did not violate the Fourth Amendment.[15] The Court has already determined that the entry and the seizure of the minor children violated the Fourth Amendment and will enter summary judgment for Plaintiffs on these claims. Accordingly, the Court will deny the City Defendants' request for summary judgment with respect to the Fourth Amendment claims.

### (10) Procedural and Substantive Due Process Claims

Defendants Brown, Baldwin, and Beatti next contend that they are entitled to summary judgment on Plaintiffs Patrick and Sandra O'Donnell's procedural and substantive due process claims. With respect to procedural due process, the Court concluded in its foregoing discussion of Plaintiffs' summary judgment motion that all

---

**14.** Defendants have not requested summary judgment on John's false imprisonment claim (fifth claim). Accordingly, that claim survives summary judgment.

**15.** The City Defendants argue that Patrick and Sandra O'Donnell cannot assert a Fourth Amendment claim on their own behalf for the seizure of the minor children or the arrest of John because they lack standing. *See Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978) (explaining that Fourth Amendment rights are personal rights which may not be vicariously asserted). However, Plaintiffs have clarified that Patrick and Sandra are not attempting to assert Fourth Amendment claims on behalf of their children. Their Fourth Amendment claim is instead for unlawful entry of their home, and this is a claim they may assert because they have a privacy interest in their home, whether or not they were present at the time of the entry. *See, e.g., Michigan v. Clifford*, 464 U.S. 287, 295, 104 S.Ct. 641, 648, 78 L.Ed.2d 477 (1984).

Plaintiffs were denied their procedural due process rights and thus summary judgment should be granted to them on the second cause of action. Accordingly, the Court will deny summary judgment to Defendants and instead order summary judgment for Plaintiffs on the procedural due process claims.

Turning to the substantive due process claims set forth in the third cause of action, the substantive component of the Due Process Clause provides "heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997). The Supreme Court has consistently recognized that rights involving family life are worthy of special constitutional protection. *See, e.g., Moore v. City of East Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935–36, 52 L.Ed.2d 531 (1977) (listing cases). Courts have recognized in various situations an abstract fundamental liberty interest in familial integrity. *See Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir.1994). This interest includes parents' rights to make decisions about the care, custody, and management of their children. *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982) (there is "a fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Glucksberg*, 521 U.S. at 720, 117 S.Ct. at 2268 (stating that parents have a fundamental right to direct the upbringing of their own children) (citing *Meyer v. Nebraska*, 262 U.S. 389, 43 S.Ct. 625 (1923)); *Doe v. Staples*, 706 F.2d 985, 988 (6th Cir.1983) ("[I]t is axiomatic that a parent has a liberty interest in the freedom of personal choice in matters of family life in which the state cannot interfere.") (citing *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) and *Stan-*

*ley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).

The fundamental constitutional right to family integrity extends to all family members, both parents and children. *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir.2000) ("Parents and children have a well-elaborated constitutional right to live together without governmental interference.") (citing Supreme Court cases); *Wooley v. City of Baton Rouge*, 211 F.3d 913, 923 (5th Cir.2000) ("a child's right to family integrity is concomitant to that of a parent"). Also, the right of familial association is included in the Fourteenth Amendment substantive due process right of freedom of intimate association. *J.B. v. Washington County*, 127 F.3d 919, 927 (10th Cir.1997).

The government action in this case—removing the O'Donnell children from the family home while the parents were away—encroached upon the O'Donnell's right to familial integrity. *See J.B. v. Washington County*, 127 F.3d 919, 927 (10th Cir.1997) ("[I]t is evident that there was interference with plaintiffs' rights of familial association because L.B. was physically removed from her home and from her parents for a period of almost 18 hours, which included an overnight stay in a pre-arranged shelter home.") (internal quotation marks and citation omitted). The removal impinged on the parents' interests in making decisions regarding the care of their children and all family members' interests in remaining together as a family unit. However, fundamental rights are not absolute, and the state may burden their exercise in limited circumstances. *See, e.g., Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir.1994) ("The right to familial integrity ... has never been deemed absolute or unqualified.") "Government actions that burden the exercise of those fundamental rights or liberty in-

terests are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir.2000). Accordingly, the Court must ask first, whether the government has demonstrated a compelling government interest to warrant the removal of the children, and second, whether the removal was narrowly tailored to achieve that interest.[16]

 With respect to the compelling interest prong of the substantive due process test, the government has a compelling interest in protecting minor children from abuse or neglect. *See, e.g., Martinez*, 35 F.3d at 1490 (recognizing that the state has a compelling interest in the health, education, and welfare of children) (citing cases). Moreover, "[t]he right to family integrity does not include a constitutional right to be free from child abuse investigations." *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir.1993)· (citing *Stanley v. Illinois*, 405 U.S. 645, 649, 92 S.Ct. 1208, 1211–12, 31 L.Ed.2d 551 (1972) (stating that the government has a "right—indeed, duty—to protect minor children through a judicial determination of their interests in a neglect proceeding")). "[T]he relationship between parent and child may be investigated and terminated by the state provided constitutionally adequate procedures are followed." *Watterson*, 987 F.2d at 9 (citing *Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599

(1982)). The constitutional right to familial integrity must be balanced against the government interest involved. *See Martinez*, 35 F.3d at 1490 (citing cases).

 Defendants contend that the compelling government interest here was to investigate and act upon the child neglect complaint by the children's aunt. According to Defendants, a concern for the children's welfare arose from the fact that a 12 year old boy was alone to care for three younger siblings, one of whom was 6 months old. Plaintiffs respond that no compelling reasons for disturbing the O'Donnell parents' plan for managing their family arose when they left a 16 and 17 year old in charge for a few days; when a trained 12 year old took charge of the younger siblings for several hours and then the 16 and 17 year olds returned; and when a neighbor and the family's pastor offered to stay with the children. The Seventh Circuit has recognized that "a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir.2000). Earlier in this Opinion, the Court concluded that exigent circumstances did not exist in this case because no facts indicated a risk of immediate danger to the children. Therefore, Defendants have not established as a matter of law the compelling interest nec-

16. Defendants argue that substantive process is implicated only where the state's conduct is such that it "shocks the conscience." *See Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952). However, the "shocks the conscience" test is only one of two tests by which substantive due process is examined, and it is used when plaintiffs do not allege the violation of a specific protected liberty or property interest. *Id.; see also Howard v. Grinage*, 82 F.3d 1343, 1350 (6th Cir.1996) ("For a claim brought under substantive due process where a nonfundamental right is implicated, the plaintiff must show that the conduct shocks the conscience of the court."). Where, as here, Plaintiffs have alleged the violation of a recognized liberty interest, family integrity, the Court applies the second substantive due process test, which requires a compelling government interest and narrowly tailored conduct. *See Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir.1991).

essary to satisfy the first prong of the strict scrutiny test, making summary judgment in their favor inappropriate.

Moreover, whether Defendants have satisfied the second prong of the strict scrutiny test (i.e., narrow tailoring) remains an open question. Defendants argue that no less restrictive means was available under the circumstances given the lateness of the night, the fact that the parents could not be reached even after their contact information was provided, and no other appropriate caregiver was immediately available. Defendants maintain that the children were subjected to the least possible degree of disruption: they were placed with their grandmother in the most family-like setting available at the time, and they were only outside of their home for approximately 36 hours until the authorities learned of the parents' whereabouts and they returned home. Plaintiffs respond that removing the children was not the most narrowly tailored means of protecting them, given that a 16 year old was available to care for the younger siblings and that a neighbor and the family's pastor had offered to stay at the home as well.

Because the Court cannot rule as a matter of law that Defendants have satisfied the strict scrutiny test, the Court will deny Defendants' request for summary judgment on the substantive due process claims of the third cause of action.

### (11) Qualified Immunity: Brown, Baldwin, Beatti, Alley

In the alternative, Defendants Brown, Baldwin, Beatti, and Alley argue that they are entitled to qualified immunity on Plaintiffs' § 1983 claims [17] brought against them in their individual capacities. Qualified immunity shields from liability government officials performing discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

Under the *Harlow* standard, a court must first determine whether, viewing the facts in the light most favorable to the party asserting the injury, the plaintiff has alleged a deprivation of a constitutionally protected right. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 2155, 150 L.Ed.2d 272 (2001). If so, "then the second step is to determine whether the right is so 'clearly established' that a 'reasonable official would understand that what he is doing violates that right.'" *Brennan v. Township of Northville,* 78 F.3d 1152, 1154 (6th Cir.1996) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). The Court has already concluded that Plaintiffs have sufficiently alleged (and with respect to some claims, established as a matter of law) several constitutional violations on the part of the City Defendants relating to the Fourth Amendment's search and seizure protections, procedural due process, and substantive due process. Accordingly, the Court proceeds to the second step of the analysis.

An objective standard governs the second inquiry. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. "The determination as to whether the right was 'clearly established' is a determination that 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Greene v. Barber,* 310 F.3d 889, 894 (6th Cir.2002) (citing *Saucier,* 533

---

**17.** In order to state an actionable claim pursuant to 42 U.S.C. § 1983, a plaintiff must establish that (1) he was deprived of a right established by the U.S. Constitution or federal law and (2) the defendants, acting under color of law, caused the deprivation. *See Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978).

U.S. at 201, 1221 S.Ct. at 2156). In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156. As the Sixth Circuit has explained, "[t]he standard of objective reasonableness requires us to ask whether every 'officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.'" *Bills v. Aseltine,* 52 F.3d 596, 603 (6th Cir.1995) (citing *Brandenburg v. Cureton,* 882 F.2d 211, 215 (6th Cir.1989)). "A court should be wary of simply substituting its view in hindsight for the police officers' opinion." *Bills,* 52 F.3d at 603. To find a clearly established constitutional right, a district court must find binding precedent from the Supreme Court, its court of appeals, or itself. *See Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988).

The police officer Defendants argue that even if the referee's verbal order was constitutionally infirm, a reasonable police officer would not have known that to be the case and thus would not have known that the entry into the home and seizure of the children violated Plaintiffs' constitutional rights. In the officers' view, they reasonably believed that the referee had issued a valid order for the children to be removed from the home, and they merely followed Police Department policy by acting on the order. "A police officer may be entitled to qualified immunity, obviously, even though he has in fact violated the plaintiff's rights; 'reasonable mistakes can be made as to the

legal constraints on particular police conduct.'" *Greene,* 310 F.3d at 894 (quoting *Saucier,* 533 U.S. at 205, 121 S.Ct. at 2158). "If the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense." *Saucier,* 533 U.S. at 205, 121 S.Ct. at 2158.

■■■ The Court concludes that it cannot presently hold that the police officers have qualified immunity because a material factual dispute remains unresolved regarding when the verbal order arrived. According to the CPS Defendants, the verbal order came after the entry into the home. In contrast, the City Defendants argue that the verbal order came prior to the entry. If the verbal order came before the entry, then the police officers' (mistaken) reliance on it was reasonable for qualified immunity purposes because the invalidity of verbal orders was not "clearly established" at the time of the incident. Earlier in this Opinion, the Court noted that some courts have permitted telephonic search warrants, even in the absence of statutes authorizing such warrants, when adequate procedural guarantees were followed. Here, the police officers did not know what sort of procedural measures the referee had performed behind the scenes in conjunction with issuing the verbal order. Moreover, the police officers say they believed, based on their training and experience and what was undisputably Lansing Police Department policy at the time, that a verbal order to remove children carried with it the authority to enter a home. (Brown Dep. at 13–15, 17, 27, 37–38, City Def.'s Br. Supp. Mot. Summ. J. Ex. 4; Baldwin Dep. at 17–19, *Id.* Ex. 5; Beatti Dep. at 11–12, *Id.* Ex. 6.) The Court concludes that following Departmental policy was a reasonable course of action. Also, the Court has not found any binding court

opinion expressly denouncing the validity of verbal child removal orders in Michigan. Therefore, the individual police officer Defendants would be entitled to qualified immunity from any constitutional claims stemming from their entry into the house and seizure of the children if these events followed the issuance of the verbal order.[18]

The police officers, however, are not entitled to qualified immunity for anything they did prior to receiving the verbal order. They acknowledge that a court order was necessary to authorize the entry; a verbal one would do, they incorrectly believed, but they understood that at least *some* sort of order was required. The police also acknowledge that in the absence of a court order, only exigent circumstances would have permitted entry into the O'Donnell home. The Court has already determined as a matter of law that no exigent circumstances existed here, and the police officers themselves concede as much. (City Defs.' Br. Supp. Mot. Summ. J. at 31 (the police officers "did not believe the minor children were in immediate danger and thus exigent circumstances did not exist")). No reasonable police officer under these circumstances would have believed that entry was lawful without either a verbal court order or exigent circumstances. The Court concludes that the dispute as to when the verbal order arrived precludes granting the police officers qualified immunity.

## C. CPS Defendants' Motion for Summary Judgment

The CPS Defendants' summary judgment motion argues the following: (1) Plaintiffs' Fourth Amendment claim fails as a matter of law and fact because the police officers entered the home pursuant to a valid court order and the CPS Defen-

dants properly accompanied them to assess the risk of harm to the minor children and to effectuate their removal and placement; (2) Plaintiffs' procedural due process claim fails as a matter of law and fact because Plaintiffs were accorded appropriate due process and, alternatively, adequate post-deprivation remedies were available to cure any violation; (3) Plaintiffs' substantive due process and family integrity claims fail as a matter of law and fact because the right to care and custody of one's children and family association is not absolute and may be interrupted to protect children from parental and other harm; (4) Plaintiffs' claims are barred by immunity granted by law; (5) Plaintiffs' state law claims fail as a matter of law and fact; (6) Plaintiffs' state law claims are barred by immunity granted by law; (7) Plaintiffs' claim for declaratory judgment and permanent injunction fail as a matter of law; (8) jurisdiction over Plaintiffs' claims for money damages against the official capacities of the CPS Defendants is barred by the Eleventh Amendment; the official capacity claims also fail as a matter of law because these Defendants are not persons within the meaning of § 1983 in their official capacities.

### (1) Fourth Amendment Claims

### (a) Entry Into Home

 The CPS Defendants acknowledge that social workers such as themselves may not enter homes in order to effectuate the removal of a child. (CPS Defs.' Br. Supp. Mot. Summ. J. at 7 ("These defendants do not, themselves, have the authority to enter a home to effectuate the removal of a child.")). Only police may perform the entry, with social workers following them in. The Court has already concluded that the police officers illegally entered the

---

**18.** The police also receive qualified immunity from claims based on John's arrest if the arrest occurred after receipt of the verbal order.

home because they lacked written authorization and no exceptions to the warrant requirement applied.[19] The question, then, is whether the CPS Defendants' entry, following the police officers' unlawful entry, also violated the Fourth Amendment.

The CPS Defendants cite several cases holding that the presence of private citizens at a search will not be a constitutional violation when those individuals enter to aid police officers. *See Bills v. Aseltine,* 52 F.3d 596, 603 (6th Cir.1995) (private security agent participated in search; "under certain circumstances, the presence of private citizens at a search will not be a constitutional violation, particularly when they are assisting the police"); *United States v. Clouston,* 623 F.2d 485, 486–87 (6th Cir.1980) (telephone company employees present during police search in order to identify electronic equipment owned by their employer; "[i]t is clear that the telephone company employees were present on the premises in aid of the officers who were authorized to conduct a search for electronic devices, that they were there at the request of the officers and that the officers were present and acting in execution of the warrant"); *Buonocore v. Harris,* 65 F.3d 347, 357–58 (4th Cir.1995) (private security officer from telephone company accompanied police to assist in search for stolen company property). The CPS Defendants contend that their roles in the instant case were identical to the private citizens in the aforementioned cases.

■ These cases are inapposite for several reasons and do not serve to sanitize the social workers' entry. First, the police in the cases the CPS Defendants cite had valid search warrants, and the question was whether private citizens could assist them in executing the warrants. Here, there was no valid warrant authorizing entry into the O'Donnell home. Second, the CPS Defendants were not private citizens, and neither were they, as they argue, acting "like" private citizens. They were instead government agents— social workers performing government functions—taking children into custody. This is, after all, a § 1983 action. The Court concludes that the entry of CPS Defendants Parks and Duhm into the O'Donnell home was every bit a Fourth Amendment violation as the police officers'.

■ Next, CPS Defendant Sharp argues that she could not have committed a Fourth Amendment violation with respect to the entry of the home because she did not enter the home, was not at the scene, did not authorize the entry, and did not participate in the decision to enter. The scope of Sharp's involvement, if any, in the decision to enter the home remains a disputed issue of fact. Various individuals have testified that the referee issued the removal and placement order before the CPS Defendants entered the home, which would implicate Sharp's knowledge of and participation in the decision. Other testimony suggests that Sharp was not involved. In view of this factual dispute, summary judgment in Sharp's favor is inappropriate.

**(b) Removal of Children**

■ The Court has already decided to grant summary judgment to Plaintiffs on their claim that the removal of the children violated the Fourth Amendment. Accordingly, the CPS Defendants' request for summary judgment in their favor on this claim will be denied. With respect to CPS Defendant Sharp, the scope of her involve-

---

**19.** As the Court discussed previously, entry into a home constitutes a "search" implicating the Fourth Amendment; a search in the literal sense is not necessary for a Fourth Amendment violation to occur.

ment in the decision to remove the children remains in dispute and likewise cannot be resolved on summary judgment.

### (c) Arrest of John

■ The CPS Defendants point out that they were not involved in either the decision to arrest or the actual arrest of John O'Donnell. The Court agrees. John's only claim with respect to his arrest is against the City Defendants; he has no Fourth Amendment claim against the CPS Defendants with respect to his arrest.

### (2) Procedural Due Process

■ The CPS Defendants seek summary judgment on Plaintiffs' procedural due process claims, arguing that these claims must fail because Plaintiffs received sufficient pre-deprivation due process and, alternatively, adequate post deprivation remedies cured any violation. The Court concluded earlier in this Opinion that Plaintiffs suffered procedural due process violations based on the deprivation of their familial integrity rights without due process of law. The Court therefore granted summary judgment to Plaintiffs on this claim. Accordingly, the Court will deny summary judgment for the CPS Defendants.[20] With respect to Defendant Sharp, once again, fact questions about her involvement in the removal decision remain unresolved. Thus, summary judgment in her favor is unwarranted.

### (3) Substantive Due Process

The Court has already determined that whether Plaintiffs suffered violations of their substantive due process rights to familial integrity remains a disputed question inappropriate for summary judgment. Accordingly, the CPS Defendants' motion for summary judgment with respect to the substantive due process claims will be denied. Defendant Sharp is not entitled to summary judgment due to the factual disputes already discussed.

### (4) Absolute Immunity; Qualified Immunity

The CPS Defendants argue that absolute immunity shields them from any of Plaintiffs' claims premised on obtaining from the family court an order for removal and placement of the children and the filing of the petition. Alternatively, these Defendants contend that Plaintiffs' claims are barred by qualified immunity.

■ The Court rejects the CPS Defendants' attempt to assert absolute immunity based on *Kurzawa v. Mueller*, 732 F.2d 1456 (6th Cir.1984) (holding that social workers involved in prosecuting child neglect petitions are integral parts of a judicial process and thus receive absolute immunity for those actions). Absolute immunity protects acts that are judicial or prosecutorial in nature and performed by or related to a general function normally performed by an adjudicator. *Dean v. Byerley*, 354 F.3d 540, 556 (6th Cir.2004). For example, absolute immunity protects the family court referee in this case. Referee Whitworth cannot be sued for the decisions she made regarding the removal of the O'Donnell children, as that is a judicial function. Similarly, social workers receive absolute immunity when they initiate proceedings related to child welfare and while functioning in roles intimately associated with the judicial phase of the proceedings. *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 421–22 (6th Cir.2001). The CPS workers' recommendations to the

---

20. The CPS Defendants did not participate in the arrest. Therefore, the Court will grant summary judgment for the CPS Defendants on any claims John may have against them stemming from his arrest. Likewise, John can bring no procedural due process claims against the CPS Defendants based on his arrest.

family court, as well as their investigation leading up to those recommendations, relate to the initiation of judicial proceedings and thus fall within the scope of absolute immunity. *Id.* at 422–23. However, the CPS Defendants' activities relating to carrying out the removal were not judicial or prosecutorial functions are thus these Defendants are not entitled to absolute immunity from Plaintiffs' claims. *See, e.g., Achterhof v. Selvaggio,* 886 F.2d 826, 830–31 (6th Cir.1989).

■ Turning to the CPS Defendants' request for summary judgment based on qualified immunity, the Court has set forth that doctrine's general requirements in its discussion of the City Defendants' summary judgment motion. First, regarding the claims relating to the entry into the home, the CPS Defendants acknowledge that they lacked authority to enter on their own but say they relied in good faith on the police officers' decision to enter, and thus did not violate a clearly established right. However, the Defendants provide no support for the proposition that social workers can simply rely on police officers' decisions without regard to the Fourth Amendment, and this idea was rejected in *Walsh v. Erie County Department of Job & Family Services,* 240 F.Supp.2d 731 (N.D.Ohio 2003). In that case, child protection service social workers sought qualified immunity based on the argument that a reasonable caseworker would not have realized that a warrant was required to enter a home. The court rejected this argument, finding instead that the Fourth Amendment's warrant requirement was clearly established:

> Basic and applicable Fourth Amendment principles were clearly articulated and firmly embedded in our constitutional jurisprudence well before the events giving rise to this suit: government officers cannot enter a home without either prior court approval, consent, or exigent cir-

cumstances....These are bedrock principles that the law properly presumes are known to every agent of the state who seeks to enter a private home— even in the name of ensuring a child's welfare.

*Id.* at 758–59. This Court agrees with the Ohio court. As with the police officer Defendants, the fact dispute regarding when the verbal order was issued precludes granting the CPS Defendants qualified immunity for the entry into the home. If the verbal order came before the entry, then the CPS Defendants' reasonably relied on it to go into the home and are entitled to qualified immunity. If, on the other hand, the verbal order arrived after the entry, the CPS Defendants violated clearly established Fourth Amendment rights and cannot receive qualified immunity. With this factual dispute unresolved, the Court cannot make a conclusive ruling.

■ Next, the CPS Defendants contend that qualified immunity bars Plaintiffs' claims relating to the removal of the minor children from the home. The CPS Defendants argue that there was no clearly established right against removal based on a referee's verbal order; they were merely following a standard practice that appeared to be endorsed by state law and had never been criticized by a court. While that may be true, Plaintiffs additionally allege that the removal was constitutionally flawed because the CPS Defendants failed to adequately investigate the circumstances leading to the removal, failed to verify critical information before seizing the children, and recklessly gave the referee false information. Viewing these allegations in the light most favorable to Plaintiffs, as the Court must on summary judgment, the removal process may have suffered constitutional defects based on these additional facets of the CPS Defendants' conduct. Accordingly,

the CPS Defendants are not entitled to qualified immunity from Plaintiffs' claims stemming from the removal.

### (5) State Law Claims

The CPS Defendants argue that Plaintiffs' state law claims for violation of Article 1, § 11 of the Michigan Constitution, false imprisonment, and negligence fail as a matter of law and fact. First, with respect to the state constitutional claim, the CPS Defendants are entitled to summary judgment for the reasons stated in the Court's discussion of the City Defendants' summary judgment motion.

Next, false imprisonment is the unlawful restraint of an individual's personal liberty or freedom of movement without the right or authority to do so. *Tumbarella v. Kroger Co.*, 85 Mich.App. 482, 489, 271 N.W.2d 284, 287 (1978). Plaintiffs allege that the minor children were falsely imprisoned when they were forcibly removed from the home and placed elsewhere. The Court has already concluded that the CPS Defendants lacked legal authority to remove the children. The Defendants cannot avoid liability for false imprisonment by claiming that they thought their conduct was permissible based on state statutes, CPS protocols, and the referee's verbal order. *See id.* at 490, 271 N.W.2d at 288 ("In an action for false imprisonment plaintiff need not allege malice or the absence of probable cause on behalf of the defendants in order to recover"; "it is for the person who has committed the trespass to show that it was legally justified"). Because the CPS Defendants lacked the legal justification to remove the children, the false imprisonment claims survive summary judgment.

Plaintiffs' negligence claim alleges that the CPS Defendants acted with gross negligence and reckless disregard for their rights. Gross negligence means conduct so reckless as to demonstrate a sub-stantial lack of concern for whether an injury results. M.C.L. § 691.1407. The CPS Defendants argue that their conduct did not comprise gross negligence because they were responding to a child neglect complaint that the law compelled them to investigate, that they were cooperating with the police as required by law and policy, that they were acting on the referee's verbal order, and that they provided a hearing two days after the incident. Plaintiffs, however, have alleged that the CPS Defendants failed to properly investigate the situation and recklessly reported false information. Based on Plaintiffs' allegations, whether the CPS Defendants' conduct constituted gross negligence is a disputed fact issue inappropriate for resolution on summary judgment.

### (6) State Law Tort Claims: Immunity

The CPS Defendants argue that decisions regarding the removal and placement of the minor children are accorded absolute immunity, and thus Plaintiffs' claims for false imprisonment and for negligence with respect to the removal are barred. As already discussed, absolute immunity shields judicial and prosecutorial acts, but the removal of the children was not such an act.

Next, the CPS Defendants argue that they receive immunity under Michigan's Child Protection Act, M.C.L. § 722.625. Defendants' reliance on this statute is mistaken, as the purpose of the Child Protection Act is to protect the confidentiality of persons reporting suspected child abuse or neglect. 1978 Op. Mich. Atty. Gen. No. 5297, at 430. Persons making such reports are immune from civil or criminal liability. *Warner v. Mitts*, 211 Mich.App. 557, 536 N.W.2d 564 (1995). In the instant case, for example, the person who alerted the authorities to the situation at the O'Donnell home benefits from im-

munity. However, the statute does not extend immunity to even good-faith acts that may violate other requirements of the law, such as the CPS Defendants' alleged actions giving rise to Plaintiffs' claims. *Lavey v. Mills*, 248 Mich.App. 244, 251, 639 N.W.2d 261, 265 (2001). Accordingly, the Court rejects the CPS Defendants' assertion of immunity pursuant to M.C.L. § 722.625.

Finally, the CPS Defendants reiterate their assertion of governmental qualified immunity, arguing that state law affords them such immunity except where their conduct constitutes gross negligence that is the proximate cause of the alleged injuries. M.C.L. § 691.1407(2); *Robinson v. City of Detroit*, 462 Mich. 439, 613 N.W.2d 307 (2000). As the Court has discussed above, whether the CPS Defendants committed acts of gross negligence remains disputed and therefore summary judgment cannot ensue on these Defendants' assertion of qualified immunity.

### (7) Equitable Relief

■ The CPS Defendants contend that Plaintiffs' claims for equitable relief in the forms of a declaratory judgment and permanent injunction fail because they are no more than a reiteration of Plaintiffs' other claims and because Plaintiffs have an adequate remedy at law. The equitable relief Plaintiffs seek consists of the following: a declaration that the statutes and protocols under which Defendants acted are unconstitutional as applied; a preliminary and permanent injunction against Defendants from engaging in the unconstitutional actions alleged in the complaint; and a preliminary and permanent injunction against Defendants from applying and enforcing the statutes and protocols in an unconstitutional manner. However, the CPS Defendants have provided no authority to support their request for summary judgment regarding the equitable relief. According-ly, the Court will deny judgment for Defendants at this time.

### (8) Eleventh Amendment State Sovereign Immunity; Official Capacity § 1983 Claims—Whether Defendants are Persons

■ The CPS Defendants contend that the principle of state sovereign immunity embodied in the Eleventh Amendment bars jurisdiction over Plaintiffs' claims for money damages against them in their official capacities. The Eleventh Amendment bars suits against states absent consent or congressional abrogation. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54–55, 116 S.Ct. 1114, 1122–23, 134 L.Ed.2d 252 (1996). Plaintiffs counter that they seek money damages against the CPS Defendants in their individual, not official, capacities. State sovereign immunity does not bar Plaintiffs' claims as framed in this manner because they are not claims against the state. Thus, the Court will deny summary judgment for the CPS Defendants based on the Eleventh Amendment.

■ Next, the CPS Defendants contend that they are officers of the State of Michigan and thus not "persons" within the meaning of 42 U.S.C. § 1983 and not subject to suit in their official capacities. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (holding that state officials acting in their official capacities are not "persons" under § 1983). The Court agrees with the CPS Defendants that official capacity claims against them are barred, but Plaintiffs once again state that they seek money damages against these Defendants only in their individual capacities. For this reason, the Court will deny summary judgment for the CPS Defendants on the individual capacity claims.

#### IV. *Conclusion*

For the reasons stated above, each of the parties' motions for summary judgment will be granted in part and denied in part. An Order consistent with this Opinion will follow.