[This decision has been published in *Ohio Official Reports* at 92 Ohio St.3d 348.]

MARSHALL, APPELLANT, *v.* MONTGOMERY COUNTY CHILDREN SERVICES BOARD, APPELLEE, ET AL.

[Cite as *Marshall v. Montgomery Cty. Children Serv. Bd.*, 2001-Ohio-209.]

*Juvenile law—Child abuse—Political subdivision tort liability—Within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), R.C. 2151.421 does not expressly impose liability for failure to investigate reports of child abuse.*

(No. 00-865—Submitted December 13, 2000—Decided July 25, 2001.)

CERTIFIED by the Court of Appeals for Montgomery County, No. 17856.

_____

SYLLABUS OF THE COURT

Within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), R.C. 2151.421 does not expressly impose liability for failure to investigate reports of child abuse.

_____

DOUGLAS, J.

{¶ 1} On October 2, 1996, Rozanne Perkins beat her two-and-a-half-year-old son Davon on the head. He died of his injuries the next day. Prior to the murder of her son, Perkins had a substantial history of abusing her children beginning in 1985. From 1985 to 1995, Perkins had four other children in addition to Davon. During the same time period, but prior to the birth of Davon, Montgomery County Children Services Board ("CSB") responded to numerous complaints regarding Perkins's abuse of her children. Perkins was alcohol- and drug-dependent. CSB ultimately removed all four of Perkins's children from her custody and control.

{¶ 2} CSB received the first report of abuse of the Perkins's children in 1985, when it was alleged that Perkins was slapping her three-month-old child,

Ebony. In 1987, a report was made to CSB alleging that Perkins had abandoned and physically abused two of her children, Ebony and Gary. However, CSB was unable to substantiate the claims. In 1988, CSB once again received allegations that Perkins had abandoned her children; however, CSB has no record of any charges of abuse then. CSB assisted the paternal grandmother, Doris Harris, to obtain custody of Ebony and Gary. Perkins did not appear at the hearing to contest custody.

{¶ 3} In August 1992, Perkins was once again referred to CSB, this time for beating her son Dorian with a belt and striking him in the eye. CSB then assigned a caseworker to the Perkins family on an ongoing basis. Perkins admitted to the CSB caseworker that she had beaten the child with the belt but stated that she "wouldn't do it anymore as long as the child didn't cry anymore." Due to the severity of the abuse, CSB removed Dorian from his mother's custody to the custody of his aunt, Ruby Perkins. CSB determined that in order to regain custody of her children, Perkins must attend parenting and chemical dependency classes and submit to a psychological review. Perkins failed to comply with the requirements of the chemical-dependency program.

{¶ 4} CSB continued to work with Perkins over a fourteen-month period, during which Perkins gave birth to yet another child, Darian. A toxicology screen performed shortly after Darian's birth indicated that the child was born alcohol-dependent and also tested positive for narcotics. CSB concluded that Darian had been heavily exposed to a variety of drugs and alcohol prior to his birth. As a result, CSB removed Darian from Perkins's custody and placed him with Robin Marshall, Darian's paternal aunt. None of Perkins's children was returned to her.

{¶ 5} During this time period, CSB had a policy of closing all cases where no child remained in the home, even if CSB was aware that the mother was pregnant with another child. Prior to closing the case file, CSB became aware that Perkins was pregnant with a fifth child. Because no children remained in Perkins's home,

CSB closed the file even though Perkins was pregnant, had a history of abusing her children, and Perkins was suspected of still being dependent on alcohol and drugs. On October 14, 1993, Perkins's caseworker pointed out in her final report that Perkins was "approximately 4-5 months pregnant." In addition the caseworker reported, "I would not be surprised in the least if the Agency receives a referral on her for a drug exposed infant when she delivers in February or March."

{¶ 6} Also during this time, CSB had a classification system for the cases that were reported. The priorities were listed as levels one through four. A level-one priority was the most critical and level four was the least critical. A level-one priority required CSB to make contact with the child within one hour of the report. A level-two priority required CSB to make contact with the child within twenty-four hours. A level-three priority required CSB to initiate a case within twenty-four hours and make contact with someone familiar with the case, not necessarily the parent or child victim. CSB established no minimum response time for a level-four priority, and the priority level could change depending upon the information gathered. The levels CSB assigned to cases could be altered once a review of any existing record indicated that based upon an existing history, the case required a higher level of priority.

{¶ 7} Perkins gave birth to her fifth child, Davon, on February 2, 1994. CSB received no reports from the hospital that Davon was alcohol- or drug-dependent. On October 24, 1994, CSB received a report from Danny McLemore, Perkins's boyfriend and Davon's father, requesting that CSB check on the child due to the mother's substance-abuse problem. CSB assigned the case as a level-three priority, which required that contact be made with someone familiar with the case within twenty-four hours. The caseworker assigned to the case reviewed the records that CSB maintained regarding Perkins and was aware that Perkins had a history of substance abuse and that four of her children had been removed from her

home. Despite Perkins's history, CSB made no changes to the level of priority of the McLemore complaint concerning Davon.

{¶ 8} The CSB caseworker assigned to investigate the complaint concerning Davon attempted to contact Perkins through an unannounced home visit on October 25, 1994. However, no one was home, and a contact letter was left requesting that Perkins contact CSB. The caseworker made additional attempts to contact Perkins on November 14, and December 1, 1994, and January 10, 1995, each time leaving a note requesting Perkins to contact CSB. Perkins failed to respond. Contrary to the requirements of a level-three priority, the caseworker did not attempt to contact any other persons during this time period.

{¶ 9} On April 19, 1995, nearly six months after McLemore's complaint, CSB made contact with Perkins. The caseworker's report indicated that Perkins denied any substance abuse. The caseworker also found that Perkins's house was clean and that Davon did not appear to be neglected. Based upon the caseworker's home visit the case was closed.

{¶ 10} On October 6, 1995, the Dayton Police Department arrested Perkins for domestic violence. Perkins attempted to stab McLemore while he was driving, forcing him to pull the car off the road in order to disarm Perkins. Davon was a passenger in the rear seat of the car during this altercation. Perkins was later charged with child endangering as a result of this incident.

{¶ 11} During this time, CSB and the Dayton Police Department ("DPD") had an agreement that DPD would report to CSB all complaints that DPD received of child abuse, child neglect, and child endangering. DPD placed all of the reports that it received into a box located in the detective section of DPD. Every morning a CSB employee would retrieve the reports that DPD had placed in the box. CSB immediately investigated all criminal charges of child endangering that were received. Due to her altercation with McLemore, Perkins was arrested and charged with domestic violence and child endangering. However, contrary to the agreement

4

between DPD and CBS, DPD did not place any reports of Perkins's arrest for child endangering in the box for CSB retrieval.

{¶ 12} CSB had no further referrals of this case until October 2, 1996, the day that Davon was beaten to death by his mother.

{¶ 13} On October 1, 1997, Marshall, Davon's paternal aunt and administrator of his estate, appellant, filed a wrongful death action against CSB, Helen Jones, Director of CSB, Montgomery County, the city of Dayton, and an unnamed Dayton police officer. The complaint alleged that CSB, appellee, knew or should have known about the previous acts of violence perpetrated by Perkins against her children. The complaint further alleged that appellee negligently failed to investigate and negligently failed to remove Davon from Perkins's custody and that its negligence was the proximate cause of Davon's death. In addition, the complaint alleged that the city of Dayton, through DPD and its unnamed police officer, negligently failed to report the arrest of Perkins for domestic violence and child endangering.

{¶ 14} Appellee, Montgomery County, Jones, and Dayton filed motions for summary judgment, which were granted June 10, 1999. Appellant appealed the summary judgment in favor of CSB and Dayton. The Court of Appeals for Montgomery County affirmed the trial court's decision. In response to appellant's motion to certify a conflict, the court of appeals certified a conflict between its judgment in favor of CSB and *Rich v. Erie Cty. Dept. of Human Resources* (1995), 106 Ohio App.3d 88, 665 N.E.2d 278; *Crago v. Lorain Cty. Commrs.* (1990), 69 Ohio App.3d 24, 590 N.E.2d 15; *Sprouse v. Lucas Cty. Bd. of Edn.* (Mar. 12, 1999), Lucas App. No. L-98-1098, unreported, 1999 WL 128636; *Reed v. Perry Cty. Children's Serv.* (June 29, 1993), Perry App. No. CA-429, unreported, 1993 WL 274299. This cause is now before this court upon our determination that a conflict exists.

{¶ 15} The certified question is:

"For the purposes of the immunity exceptions in R.C. 2744.02(B)(5) and R.C. 2744.03(A)(6)(c), does R.C. 2151.421 expressly impose liability on political subdivisions and their employees for failure to investigate child abuse?"

{¶ 16} We answer the certified question in the negative. While the statutes at issue in this case are the same as those interpreted in *Campbell v. Burton* (2001), 92 Ohio St.3d 336, ___ N.E.2d ___, the issue is whether R.C. 2151.421 expressly imposes liability for a failure to *investigate* as opposed to a failure to *report* as in *Campbell*. The duty to investigate reported child abuse or neglect is required by R.C. 2151.421(F)(1), which states:

"Except as provided in section 2151.422 of the Revised Code, the public children services agency shall investigate, within twenty-four hours, each report of known or suspected child abuse or child neglect and of a known or suspected threat of child abuse or child neglect that is referred to it under this section to determine the circumstances surrounding the injuries, abuse, or neglect or threat of injury, abuse, or neglect, the cause of the injuries, abuse, neglect, or threat, and the person or persons responsible. * * * The public children services agency shall submit a report of its investigation, in writing to the law enforcement agency." It is clear that CSB had a duty pursuant to R.C. 2151.421 to investigate reports of known or suspected child abuse within twenty-four hours.

{¶ 17} In order to determine the liability of a political subdivision pursuant to the Political Subdivision Tort Liability Act, a three-tiered analysis of R.C. Chapter 2744 is required. We have set forth this analysis in *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 28, 697 N.E.2d 610, 614, and in *Campbell v. Burton* (2001), 92 Ohio St.3d 336, ___ N.E.2d ___. We will not repeat that discussion here.

{¶ 18} R.C. 2744.02(B)(5) provides:

"In addition to the circumstances described in divisions (B)(1) to (4) of this section, a political subdivision is liable for injury, death, or loss to persons or

6

property when liability is expressly imposed upon the political subdivision by a section of the Revised Code * * *. Liability shall not be construed to exist under another section of the Revised Code merely because a responsibility is imposed upon a political subdivision or because of a general authorization that a political subdivision may sue and be sued."

{¶ 19} Similar to the exception to political subdivision immunity found in R.C. 2744.02(B)(5), R.C. 2744.03(A)(6)(c) provides that an employee of a political subdivision is immune from liability unless "[l]iability is expressly imposed upon the employee by a section of the Revised Code."

{¶ 20} The court of appeals found that within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), R.C. 2151.421 does not expressly impose liability for failure to *investigate* allegations of abuse. We agree with the court of appeals but arrive at our conclusions by way of a slightly different analytical approach.

{¶ 21} In *Campbell*, *supra*, we held that R.C. 2151.99 imposes a criminal penalty for failure to report, pursuant to R.C. 2151.421(A)(1), known or suspected child abuse. We determined that within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), the term "liability" refers to either civil or criminal liability. However, in contrast to its imposition of a penalty for failure to report, R.C. 2151.99 does not impose a penalty for failure to investigate, pursuant to R.C. 2151.421(F)(1), reports of child abuse or neglect. Therefore, within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), R.C. 2151.421 does not expressly impose liability for failure to investigate reports of child abuse. Accordingly, even if it failed to investigate a report, appellee is insulated from liability by sovereign immunity.

{¶ 22} We find this troubling in light of the potential for a political subdivision to entirely disregard affirmative duties and yet avoid liability under the

cloak of sovereign immunity.[1] However, we are confined to review the law based upon the issues presented in this appeal.

**{¶ 23}** The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., concur separately in judgment.

————————————

**COOK, J., concurring in judgment.**

**{¶ 24}** R.C. 2151.421 does not expressly impose liability upon a political subdivision or its employee, within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), for failure to investigate reports of child abuse. I therefore join the syllabus and judgment of the majority. While doing so, I continue to adhere to the views expressed in my dissenting opinion in *Campbell v. Burton* (2001), 92 Ohio St.3d 336, ___ N.E.2d ___.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing opinion.

————————————

*D.K. Wehner* and *Thomas J. Replogle,* for appellant.

*Mathias H. Heck, Jr.*, Montgomery County Prosecuting Attorney*,* and *Marcell N. Dezarn,* Assistant Prosecuting Attorney, for appellee.

————————————

1. For comparison to another statute that imposes a duty but does not impose liability, see *Butler v. Jordan* (2001), 92 Ohio St.3d 354, ___ N.E.2d ___.