NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0692n.06
Filed: September 20, 2006

No. 05-3636

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

GEORGE KRANTZ,

        Plaintiff-Appellant,

        v.

CITY OF TOLEDO POLICE DEPARTMENT;
LUCAS COUNTY CHILDREN SERVICES
BOARD; KEELY GRAY; MARIO WALLACE,
OFFICER; CITY OF TOLEDO,

        Defendants-Appellees.

On Appeal from the United
States District Court for the
Northern District of Ohio

—————————————————————/

**Before:**     **GUY, SUTTON, and ALARCÓN[*], Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**     Plaintiff George Krantz appeals from the

entry of summary judgment in favor of defendants—the City of Toledo, Police Officer

Mario Wallace, the Lucas County Children Services Board (LCCS), and LCCS Caseworker

Keely Gray—on claims arising out of a traffic stop made in investigating a dispute over the

custody of his then five-year-old son. Plaintiff's amended complaint asserted various claims

under state law and for violation of 42 U.S.C. § 1983, including illegal search and seizure,

---

[*]The Honorable Arthur L. Alarcón, Senior Judge, United States Court of Appeals for the Ninth
Circuit, sitting by designation.

false arrest and imprisonment, assault, defamation, malicious prosecution, and gender discrimination.[1]  Plaintiff argues on appeal that the district court erred in finding that defendants were entitled to immunity from suit on the state law claims pursuant to Ohio Rev. Code § 2744.02 and § 2744.03.  Plaintiff also argues that the district court erred in finding on the merits that he could not prevail on his state law claims for false arrest, assault, or defamation, or his § 1983 claims for illegal search and seizure.  After review of the record and the arguments presented on appeal, we affirm.

## I.

The stop at issue arose out of a long-running dispute between George Krantz and his ex-girlfriend, Patricia Wyman, over the custody of their then five-year-old son Dakota. Krantz and Wyman split up not long after Dakota was born, a petition for custody was brought in Juvenile Court, and the LCCS filed its own petition seeking custody on the grounds that the parents' volatile relationship made conditions unsafe for the child.  The caseworker assigned to Dakota's petition was defendant Keely Gray.

Temporary custody was awarded to LCCS in early 1998, with the child residing with the maternal grandmother and both parents having supervised visitation.  In March 1999, after a hearing, Wyman was awarded legal custody of Dakota, and Krantz was granted visitation "per the standard court schedule" (except that pickups and drop-offs were to be

---

[1]False arrest and false imprisonment are the same cause of action, with false arrest involving the unlawful detention by an officer. *Rogers v. Barbera*, 164 N.E.2d 162 (Ohio 1960).  For this reason, we refer to this as a claim for false arrest.

made through a third party). Krantz filed timely objections to that order, arguing that he was prejudiced by having to proceed at the hearing despite the withdrawal of his attorney.

Those objections remained pending for three years until, on April 30, 2002, the juvenile court judge sustained the objections, vacated the custody order, and returned the case to the docket for a new hearing. Because that order did not address the matters of custody or visitation pending the hearing, legal custody of the child reverted to LCCS under the earlier custody order. There is no dispute that Gray was unaware of the objections or the decision vacating the custody order. It also appears that the parents informally continued the prior custody and visitation arrangements until early August 2002.

On August 6, 2002, Wyman filed a complaint against Krantz for interference with custody alleging that Krantz had failed to return the child at the end of his weekend visitation two days earlier. Krantz appeared on the warrant on August 12, and a hearing was scheduled for later that month. On August 14, when the child had still not been returned, Wyman went to the police for assistance. She talked to Detective Robert Schroeder and showed him the court order granting her custody. Schroeder called LCCS to check with the caseworker. The call was referred to Keely Gray, who told Schroeder that Wyman had custody of the child.

On August 15, 2002, at approximately 1:00 p.m., Detective Schroeder went to Krantz's residence where he saw Krantz get into a van with two children and drive away. Schroeder followed and confirmed that the van was registered to Krantz. Krantz, who was taking the children to a sitter, realized he was being followed and circled back around to his house. Schroeder called for uniformed officers to stop the van.

Police Officers Carol Scherer and Leah Lewis intercepted Krantz in a marked car and signaled for him to pull over. The officers could see Krantz bang on the steering wheel, mouth "that fucking bitch," and gesture out the window at them. Krantz drove around the corner, stopped against the curb in front of his house, and jumped out of the van. A neighbor witnessed Krantz yelling and using profanity at the officers, and Krantz admitted that he was "cursing." The officers drew their weapons and ordered Krantz to get back into his van three times, but Krantz ignored them and continued to yell and curse.

Police Officer Mario Wallace (the only officer named as a defendant) arrived separately and directed Krantz to put his hands on the side of the van. Krantz refused and Wallace used some force to push Krantz up against the side of the van. Wallace patted him down, handcuffed him, and held him by the neck against the van as Krantz cursed and kept trying to turn around. Krantz admitted that he offered some resistance and claimed that Wallace bounced him into the van four times.

Schroeder tried to talk with Krantz, who vehemently and loudly insisted that Wyman did not have custody of the child. Krantz said there were "court papers" inside the van that would prove this, and told the officers where to find them. Officer Scherer (who is not named as a defendant) entered the van and retrieved the papers in question. Schroeder looked at the papers, but found the question of custody was not clearly spelled out. As a result, Schroeder directed another officer, Detective Robert Maxwell, to verify the custody issue with the caseworker at LCCS. In this second call, Gray again confirmed that Wyman had legal custody of Dakota. That information was relayed to Schroeder, who then called

Wyman to the scene and allowed the child to leave with his mother.  Krantz was not placed

under arrest, transported elsewhere, or charged with any offense as a result of the stop.  The

handcuffs were removed and the officers left while Krantz yelled profanities after them.  The

entire stop lasted approximately 25 minutes.

The interference with custody charge was subsequently dismissed because custody

had reverted to LCCS under the prior order and neither Wyman nor Krantz had legal custody

of Dakota.  When the custody issue came up for rehearing in October 2002, an agreement had

been reached through mediation under which LCCS's custody was terminated, Wyman was

granted legal custody, and Krantz was awarded visitation.

This action, filed in July 2003 and amended shortly thereafter, asserted claims against

Officer Wallace, the City of Toledo, Keely Gray, and the LCCS.  In December 2004, after

an opportunity for discovery, defendants moved for summary judgment in their favor with

respect to all of plaintiff's claims.  The district court granted the defendants' motions for the

reasons set forth in the written decision of April 15, 2005, and this appeal followed.

## II.

We review the district court's decision granting summary judgment *de novo*.  *Smith*

*v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997).  Summary judgment is appropriate when

there are no issues of material fact in dispute and the moving party is entitled to judgment as

a matter of law.  FED. R. CIV. P. 56(c).  In deciding a motion for summary judgment, the

court must view the factual inferences and draw all reasonable inferences in favor of the

nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**A.      State Law Claims**

The district court granted summary judgment to all of the defendants, finding both that the defendants were entitled to immunity from suit on the state law tort claims and that plaintiff had failed to raise a question of fact on the merits. Plaintiff's appeal challenges the findings of immunity generally, and argues specifically that he could prevail on his claims of false arrest, assault, and defamation.

The Ohio Political Subdivision Tort Liability Act provides immunity from liability on state law tort claims for political subdivisions and their employees. OHIO REV. CODE § 2744.02 and § 2744.03. For political subdivisions, like the City of Toledo and the LCCS Board, a three-tiered analysis is required. *Cater v. City of Cleveland*, 697 N.E.2d 610, 614 (Ohio 1998). First, a political subdivision is "not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." OHIO REV. CODE § 2744.02(A)(1). That immunity, however, is subject to five statutory exceptions set forth in Ohio Rev. Code § 2744.02(b)(1)-(5). Finally, if an exception applies, immunity may be restored under the third tier of the analysis if the political subdivision establishes one of the defenses listed in Ohio Rev. Code § 2744.03. The employee of a political subdivision, on the other hand, is immune from liability unless: (1) the employee's acts or omissions were "manifestly outside the scope of

the employee's employment or official responsibilities"; (2) the acts or omissions were "with malicious purpose, in bad faith, or in a wanton or reckless manner"; or, (3) "[l]iability is expressly imposed upon the employee by a section of the Revised Code." OHIO REV. CODE § 2744.03(A)(6)(a)-(c).

### 1. Political Subdivisions

Plaintiff seeks to hold the City of Toledo and LCCS liable for the acts or omissions of their employees, Wallace and Gray, in connection with a governmental function. OHIO REV. CODE § 2704.01(C) (defining "governmental function"). This gives rise to immunity unless the statutory exceptions are established.

With respect to LCCS, plaintiff relies on the exception, like the one mentioned for individual employees, which provides that a political subdivision is not immune "when liability is expressly imposed upon the political subdivision by a section of the Revised Code." OHIO REV. CODE § 2744.02(B)(5) (as amended eff. June 30, 1997). Under this exception, liability is not expressly imposed "merely because that section imposes a responsibility or mandatory duty upon a political subdivision," or "because that section uses the term 'shall' in a provision pertaining to a political subdivision." *Id*; *see Estate of Ridley v. Hamilton County Bd. of Mental Retardation and Developmental Disabilities*, 809 N.E.2d 2, 7 (Ohio 2004) (discussing amendments to § 2744.02(B)(5)).[2]

---

[2]Since the events in this case, this section has been amended to clarify that the exception to immunity applies "when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code." OHIO REV. CODE § 2744.02(B)(5) (as amended eff. Apr. 9, 2003).

Plaintiff argues that LCCS is not immune from liability for Gray's conduct because she violated the duty to investigate claims of child abuse or neglect imposed by Ohio Rev. Code § 2151.421. First and foremost, as the district court observed, plaintiff's claims do not involve a failure to investigate a report of known or suspected child abuse or neglect. Instead, plaintiff argues that Gray failed to "investigate" the status of the custody order before advising the police that Wyman had custody of the child. Section 2151.421 neither creates such a duty, nor expressly imposes liability for failing to check the file to confirm the status of a custody order.

Moreover, even if plaintiff had alleged a failure to investigate a report of child abuse in violation of § 2151.421, the Ohio Supreme Court has held that § 2151.421 does not expressly impose liability on political subdivisions or their employees for failure to investigate child abuse for purposes of the exceptions to immunity under § 2744.02(B)(5) and § 2744.03(A)(6)(c). *Marshall v. Montgomery County Children Servs. Bd.*, 750 N.E.2d 549, 553-54 (Ohio 2001); *but see Campbell v. Burton*, 750 N.E.2d 539 (Ohio 2001) (holding that criminal penalty for failure to *report* child abuse as required by § 2151.421 expressly imposes liability for purposes of § 2744.05(B)(5) and § 2744.03(A)(6)(c)).

In arguing that the City of Toledo is not immune from liability under state law, plaintiff does not rely on any of the five statutory exceptions enumerated in Ohio Rev. Code § 2744.02(B)(1)-(5). Apparently confusing the exceptions that would apply to political subdivisions and their employees, plaintiff argues that the City is not immune because Detective Schroeder exceeded the scope of his authority and/or acted in a wanton or reckless

manner within the meaning of Ohio Rev. Code § 2744.03(A)(6)(a) and (b). Because plaintiff has sued the City for the acts of its employees in connection with a governmental function and has not argued that any of the exceptions to immunity for a political subdivision apply in this case, the district court did not err in granting summary judgment to the City on plaintiff's state law tort claims.[3]

## 2.     Employees

First, for the reasons discussed above, we find plaintiff cannot rely on the exception to immunity for liability "expressly imposed upon the employee by [Ohio Rev. Code § 2151.421]." OHIO REV. CODE § 2744.03(A)(6)(c). Plaintiff also argues that the individual defendants are not immune because their acts or omissions were done "with malicious purpose, in bad faith, or in a wanton or reckless manner." OHIO REV. CODE § 2744.03(A)(6)(b). Plaintiff does not actually contend that the defendants acted with malicious purpose or in bad faith, but argues that there is a question of fact whether Gray acted "negligently to the point of recklessness" or whether the police acted in a "wanton or reckless manner."

Wantonness is the perverse disregard of a known risk such that the actor must have been aware that his conduct would probably result in injury. *Fabrey v. McDonald Vill.*

---

[3]Plaintiff cites *Brodie* for the proposition that a children services board could be liable for failure to perform investigative duties under § 2151.421. *Brodie v. Summit County Children Servs. Bd.*, 554 N.E.2d 1301, 1308 (Ohio 1990). However, the question in *Brodie* was not whether there was statutory immunity, but whether the "public duty" rule was a bar to municipal liability. *See Yates v. Mansfield Bd. of Educ.*, 808 N.E.2d 861, 867 n.2 (Ohio 2004) (noting that *Brodie* arose in the 1980s during a "twilight period" when municipal liability had been judicially abolished, the new immunity statute was not effective, and the "public duty" rule would bar liability if the duty was owed to the public at large).

*Police Dep't*, 639 N.E.2d 31, 35 (Ohio 1994). One acts recklessly if he acts or intentionally fails to act in contravention of a known duty, knowing or having reason to know that her conduct creates an unreasonable risk of harm and that the risk is substantially greater than the risk necessary to make the conduct negligent. *Id.*; *Thompson v. McNeill*, 559 N.E.2d 705 (Ohio 1990). The issue of wanton or reckless conduct is typically a jury question, *Fabrey*, 639 N.E.2d at 35, but only if there is evidence from which a reasonable juror could find wanton or reckless conduct. *See Reynolds v. City of Oakwood*, 528 N.E.2d 578, 582 (Ohio App. 1987).

Gray's only involvement with the events at issue in this case was to incorrectly advise the police that Wyman had custody of the child when the truth was that neither Wyman nor Krantz had custody at that point in time. This, plaintiff contends, resulted in the stop that is the basis of the false arrest, assault, and defamation claims. Although Gray admittedly had access to the file and could have contacted the juvenile court, it is undisputed that Gray did not know about the objections plaintiff filed to the custody order three years earlier and was not aware that the custody order had been vacated pending rehearing of the custody issue. We agree with the district court that there was no evidence to support a finding that Gray acted in a wanton or reckless manner for purposes of immunity from liability on the state law claims.

With respect to Wallace, plaintiff argues that there was at least a question of fact whether he acted in a wanton or reckless manner for purposes of § 2744.03(A)(6)(b). False arrest is an unlawful detention by law enforcement. *Rogers v. Barbera*, 164 N.E.2d 162

(Ohio 1960). The force an officer uses to subdue and handcuff a suspect, unless privileged, constitutes an assault or battery. *Love v. City of Port Clinton*, 524 N.E.2d 166, 167 (Ohio 1988). Defamation is the publication of a false and defamatory statement of fact, made intentionally or with reckless disregard for the truth, that proximately causes injury to the plaintiff. *Dupler v. Mansfield Journal Co.*, 413 N.E.2d 1187 (Ohio 1980).

Wallace arrived at the scene to find plaintiff yelling, cursing, and refusing to get back into the van as ordered. Wallace used some force to restrain plaintiff to assist in effectuating the stop, which lasted 25 minutes. Plaintiff also complains that the spectacle attracted the neighbors who heard accusations that plaintiff did not have custody of the child or was unlawfully interfering with Wyman's custody of the child. Although neither actually had custody, the officers did not know that the order granting custody to Wyman had been vacated. Moreover, when plaintiff's papers called the issue into question, the police contacted Gray again to confirm that Wyman had custody before allowing the child to leave with her. We agree with the district court that the evidence and inferences taken in the light most favorable to plaintiff do not support a finding that Wallace acted in a wanton or reckless manner in connection with the detention, the manner by which it was effectuated, or any statements made concerning the custody of the child within earshot of the neighbors.

## B.    42 U.S.C. § 1983

To establish a claim under § 1983, the plaintiff must identify a right secured by the Constitution or laws of the United States and the deprivation of that right by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Although plaintiff

identifies the right to be free from unreasonable searches and seizures, plaintiff has not argued that it was error to grant summary judgment to defendants on the claim that the van was unlawfully searched.[4]  The appeal focuses instead on plaintiff's claim that he was unlawfully detained and arrested without justification or probable cause.

A seizure for Fourth Amendment purposes occurs when, by means of physical force or a show of authority, an individual's freedom of movement is restrained.  *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  The Fourth Amendment permits an officer to stop and briefly detain an individual for an investigative purpose if the officer has a reasonable suspicion supported by articulable facts that the individual is engaged in criminal activity.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Hensley*, 469 U.S. 221, 226-27 (1985).  An arrest, on the other hand, must be supported by probable cause to believe an individual has committed or is committing a criminal offense.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  The right to make a stop or an arrest necessarily carries with it the right to use some degree of physical coercion or threat of force to effectuate it.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).

It is clear that a seizure occurred when the officers stopped plaintiff's van by means of a show of authority.  The question is whether the detention was justified by reasonable suspicion or probable cause.  At the time that Detective Schroeder requested that uniformed officers make the stop, he had seen the order granting custody to Wyman, had confirmed with

---

[4]This is understandable as (1) Officer Scherer, who entered the van, was not named as a defendant; and (2) the evidence indicates that the officer entered the van to retrieve the court papers at plaintiff's insistence.

the caseworker that Wyman had custody of the child, had observed plaintiff come out of his home with two children, and had confirmed that the van was registered to plaintiff. This information provided at least reasonable suspicion that plaintiff was committing the offense of unlawful interference with custody of the child.[5]

Plaintiff's main contention seems to be that the *Terry* stop ripened almost immediately into a *de facto* arrest not supported by probable cause when the officers drew their weapons, handcuffed him, and physically held him against the van during the duration of the stop. Although no bright line distinguishes an investigative detention from an arrest, *Florida v. Royer*, 460 U.S. 491, 506 (1983), officers may not "seek to verify their suspicions by means that approach the conditions of arrest." *Id.* at 499. The factors we have considered in deciding whether that line has been crossed include transportation to another location, significant restraints on freedom of movement involving physical confinement or other coercion, and the use of weapons or bodily force. *United States v. Lopez-Arias*, 344 F.3d 623, 627-28 (6th Cir. 2003). However, we have also held that neither the officers' display of their weapons, nor the use of handcuffs exceed the bounds of a *Terry* stop when reasonably necessary for the protection of the officers or to effectuate the detention. *See*

---

[5]In connection with the issue of state law immunity, plaintiff seems to argue that the police were without authority to stop him and remove his son without a written court order or exigent circumstances. The removal of a child from his custodial parents' home is a seizure for Fourth Amendment purposes, which is constitutionally reasonable if it is pursuant to a court order, is supported by probable cause, or is justified by exigent circumstances. *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000); *see also O'Donnell v. Brown*, 335 F. Supp. 2d 787, 806-07 (W.D. Mich. 2004). It is, however, the *child's* right to be free from unreasonable seizure that is in question. In *O'Donnell*, the court was careful to distinguish the parents' claim for unlawful entry into the home from the claims of the children that their forcible removal was an illegal seizure. Overlooking whether this case even involved removal from a custodial parent, no claims were made in this case by or on behalf of Dakota.

*Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814-15 (6th Cir. 1999); *United States v. Dotson*, 49 F.3d 227, 230-31 (6th Cir. 1995).

In this case, the officers drew their weapons in order to effectuate the stop as, by all accounts, plaintiff immediately got out of the van, approached the officers while yelling profanities, and refused to comply when ordered to get back into the van. Witnessing this, Wallace ordered plaintiff to put his hands on the van. When plaintiff did not comply, Wallace pushed plaintiff against the van, handcuffed him, and held him against the van while the investigation proceeded. Plaintiff was not placed in the back of a police car, was not forcibly taken to another location, and was not given *Miranda* warnings. The officers reasonably pursued the investigation, looking at plaintiff's papers and confirming again with Gray that Wyman had custody before allowing the child to leave with his mother. The stop lasted approximately 25 minutes, at which time plaintiff was uncuffed and released. Under the circumstances, we find that Wallace participated in a lawful investigative stop that did not ripen into an informal or *de facto* arrest.[6]

We also find summary judgment was properly entered in favor of Gray because there was no evidence that Gray participated in the stop or the detention. Moreover, although plaintiff relies on *Parratt v. Taylor*, 451 U.S. 527 (1981), for the proposition that proof of negligence would be sufficient to establish a claim against Gray under § 1983, *Parratt* was overruled by *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). Nor was it error to grant summary judgment to the municipal defendants because (1) there can be no liability where

---

[6]We further agree with the district court that although no arrest was made, the officers had probable cause to arrest plaintiff for interference with lawful custody.

the plaintiff has failed to demonstrate a constitutional violation, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); and (2) plaintiff offered no evidence to show that the stop resulted from any custom, usage, or official policy of the municipal defendants, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-92 (1978).

**AFFIRMED**.